CASE 34—CONTESTED WILL—DECEMBER 12.

# Mendenhall, &c., v. Tungate, &c.

APPEAL FROM GRANT CIRCUIT COURT.

1. IN THIS CONTEST OF A WILL by which the only child of the first-born of the testatrix was, without reason, pretermitted, the ground of contest being the want of testamentary capacity upon the part of the testatrix, the verdict of a jury "for the will" is set aside upon the ground that it is not supported by the evidence, the testatrix being a paralytic for whom everything done was first conceived by those around her, and her desires and intentions arrived at by asking her speculative questions, to which she could respond "yes" or "no," that being the extent of her ability to speak.

2. MANDATE.—In reversing the judgment of the circuit court upon the verdict "for the will," this court does so with directions to the court to render a judgment directing the county court to reject the paper in contest.

H. CLAY WHITE FOR APPELLANT.

1. The opinions of witnesses as to the capacity of one to make a will are not entitled to much weight; the facts from which their opinions are deduced are more satisfactory. (McDaniel's Will, 2 J. J. Mar., 337; Hunt v. Hunt, 3 B. M., 577.)

2. Soundness of mind in a testator in making a will is capacity to know his children and his estate, and to dispose of the same in a rational manner according to a fixed purpose of his own. (Tudor v. Tudor, 17 B. M., 391.)

3. The verdict should be set aside because not sustained by the evidence. (Harrell v. Harrell, 1 Duv., 203; 11 Ky. Law Rep., 708.)

JOEL C. CLORE OF COUNSEL ON SAME SIDE.

DICKERSON & WILLIS FOR APPELLEES.

1. The law presumes the testatrix to be of testamentary capacity and sane. (79 Ky., 607.)

2. The verdict will not be set aside unless palpably and flagrantly against the evidence. The same effect is given to verdicts in proceedings to probate a will as in civil suits. (Broaddus v. Broaddus, 10 Bush, 307.)

3. The finding of the jury that the testatrix had sufficient capacity to make a will is fully sustained by the evidence. (McDaniel's Will, 2 J. J. Mar., 341.

4. To set aside a will on the ground of "undue influence" the influence

Mendenhall, &c., v. Tungate, &c.

must be such as to destroy free agency. (Wise, &c., v. Foote, &c., 81 Ky., 11; Turley v. Johnson, 1 Bush, 116; Broaddus v. Broaddus, 10 Bush, 303.)

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

A paper purporting to be the last will and testament of Sarah A. Tungate, dated May 14, 1887, was offered for probate in the Grant County Court in March, 1891. Its probation was contested by a granddaughter of the decedent — her husband joining with her — upon the ground of want of testamentary capacity on the part of the alleged testatrix, and because of undue influence exercised over her by the favorite devisees. After a thorough hearing of the testimony and a painstaking examination of the authorities on the subject, the learned judge of the county court, in an elaborate opinion, rejected the paper. The propounders appealed to the circuit court, and upon trial there the jury, under unobjectionable instructions, found a verdict " for the will "; and from the judgment thereon the contestants have appealed to this court.

The facts, and they are most singular and interesting ones, are substantially these:

In 1883, the alleged testatrix was stricken with paralysis, caused by the rupture of a vessel in the brain, or by a clot on the brain. It rendered her unconscious. She was completely paralyzed, was almost lifeless, and remained in that comatose condition for some ten days or two weeks. A considerable portion of her brain—so testifies her attending physician—was involved, and she never improved much. She did regain the use of her left limbs, and her general health was in a large measure restored. Her appetite was good. She was speechless save she could use the words " yes," " no " and " well," the usual

form of their use, being "yes, yes," "no, no" and "well, well." She was sixty-five years of age—a hopeless, bed-ridden, paralytic, requiring constant and patient nursing. In this condition she lived some seven years, and is said by some of the witnesses for the appellees to have taken a lively interest in what was going on around her. What was thought best for her by her attendants was done, though she managed to make her wants known by these monosyllables to a surprising extent. She never wrote a line after her paralysis, though she read some in her Bible. She could see and hear, and is said to have understood what was told to her. Her husband died in the spring of 1887, and she appeared depressed for some time thereafter. Tears came to her eyes when some intimate friends called to see her for the first time after his death. She was consulted as to what food she wanted, speculative questions being asked her with reference to the various articles. She appeared to remember dates, and if those talking in her presence would fix the wrong date to the age of one of the children, or to any incident of which she was supposed to have some recollection, she would say "no, no," and when the right date was fixed she would say "yes," or "yes, yes." Several of her neighbors testified to the fact that they believed her competent to understand the making of a will or other writing when read to her, and none of them testify against her sanity.

Her attending physician, and an attesting witness to the will, comes as nearly testifying against her capacity as any one not interested. He says, "I am satisfied that she understood in a measure what was said to her in regard to that will; I think she had will; I don't think her will-power was entirely lost. She could say 'yes'

and 'no' to interrogatories put to her by Mr. Dickerson, and she, I presume, understood them; I don't know. She never improved very much mentally. Nature had to make a terrible struggle for her to live at all." When asked if she had mind enough to understand the will, he said, "I think she had an idea of the drift of it; a vague idea; I dont know."

As indicated, her husband died in the spring of 1887. He had written his will in 1873, and on March 9th of the year of his death it was probated. By it the testator gave to his wife one-third of his real estate in fee and such portion of his personalty as the law would give her. Prior to this she owned no property. She left four children and a grandchild — the daughter of a deceased son—to all of whom before her affliction she was much attached. A son and daughter, both unmarried, lived with her, and a married daughter lived near by. These were with her constantly. A son lived in Texas. The granddaughter, recently married, lived some thirty-five miles away, and visited her grandmother occasionally.

The will of the husband was probated on the 9th of the month, and the one in contest was written five days thereafter. After reciting that the testatrix was of sound and disposing mind and memory, it provided: *First,* for the payment of all her just debts and funeral expenses. *Second,* for an equal distribution of her entire estate, real and personal, after the payment of her debts, among her four children, naming them, except the sum of one hundred dollars, which was given the granddaughter, Ella Tungate, and it provided, *Third,* that the granddaughter should not have any of the real estate, and only one hundred dollars of the personal estate, and this was to be

paid to her as soon after the death of the testatrix as could be done. It is a matter of interest to note, first, how the idea of making this instrument originated, and if it be supposed that this invalid could have originated the conception, to note how she communicated that intention, and in this connection we quote the testimony of the son who was her constant attendant:

" *Q.* At whose request did I go down there, who notified me to come?"

(This question was asked by the draftsman of the will, who was conducting the trial of the case for the propounders.)

" *A.* I did.

" *Q.* How came you to do that?

" *A.* Well, sir, by her request.

" *Q.* Now tell the jury how she communicated that request to you, and all about it, as near as you can.

" *A.* Well, after pa's will was written here, I talked there in the room in regard to the will, that is, what was in it, and she kept going on for several days after that, and I kept guessing and guessing, and she kept pointing up this way, and I finally guessed what it was. I asked her if she wanted to make a will; she said, 'yes.' I asked her then if she wanted Dr. Lewis to write it; she said 'no.' I then asked if she wanted you to write it; she said 'yes.' I asked her if she wanted me to tell you so; she said 'yes.'"

The draftsman found the testatrix, who was a stranger to him, in bed, and in the condition indicated by the other witnesses. He testifies that she could use only the three words, "yes," "no" and "well," but could see and hear. He says that he told her he had come at the request of

Mason to write her will, and asked her if she desired him to do so, and she answered " yes." He then asked her if she could hear distinctly all that was said to her, and she said " yes," and whether she could see, and she answered the same way. He told her that if he wrote the will, he didn't want to write anything except what she wanted, and until he got exactly what she wanted she must not agree to it. To his question whether she understood all this, she answered " yes."

The draftsman then labored some two hours, and by a series of speculative questions produced the paper offered. That he labored faithfully and honestly we have no doubt. She did not undertake to read the document, nor was any effort made to have her read it. It is not clear that she could have read it ; but it was read to her perhaps twice.

Everything done was first conceived by those around her, and she was then asked a question to which she could respond by the use of the words "yes" or "no." No other means were resorted to toward ascertaining her desires.

It is evident at the start that the question of the integrity of those around the testatrix when the paper was written is a most important one in the case, and was probably the controlling circumstance in reaching the verdict obtained. The high characters of the draftsman and of the attesting witnesses were apparently at stake, and evidently overshadowed the real question at issue. We can not bring ourselves to the conclusion, after a careful examination of the evidence, that this paper—providing, without reason, for the pretermission of this grandchild, the child of the first-born—was the offspring of a disposing mind and memory. Rational disposition, fixedness of purpose,

capacity to know the natural objects of her bounty and take a general survey of her estate are terms wholly inapplicable to the mental condition of the physical wreck under consideration. The mind revolts at the thought of it. These required mental conditions were wholly and necessarily absent, and the paper can not be regarded as coming up to the requirements of the statute or in accord with any adjudication on the subject under consideration, so far as we are advised.

The alleged testatrix, in our opinion, was not mentally competent to originate the conception of a will, and did not have the physical ability to dictate a disposition of her estate or communicate her intentions as the law requires.

The judgment is reversed, that further proceedings may be had consistent with this opinion.

———

To a motion for modification of the mandate Judge Hazelrigg delivered the following response of the court:

Under the views expressed in the opinion, nothing remains to be done in this case by the court below save to enter a judgment directing the county court to reject the paper in contest as the last will and testament of the decedent. And the motion of the appellant to have the mandate so issued is sustained.