[No. 28746. Department Two. March 17, 1943.]

*In the Matter of the Estate of* DORA E. CHAPIN, *Deceased.*[1]

*Ballinger, Hutson & Boldt* and *B. H. Camperson,* for appellants.

*Lynwood W. Fix,* for respondents.

[1]Reported in 135 P. (2d) 445.

ROBINSON, J.—This is an action to contest the will of Dora E. Chapin. Mrs. Chapin died January 14, 1941, at the age of sixty-nine. By the terms of the will, which was executed November 13, 1940, she left her property to her husband, Virgil W. Chapin, her son, Louis F. Chapin, her adopted daughter, Evelyn Dorothea Chapin, and Delbert W. Sweitzer, a one-fourth interest to each. The contestants are the husband, son, and the guardian of the adopted daughter. It is claimed that Mrs. Chapin, at the time of the execution of the will, lacked mental capacity to make a will and acted under duress and undue influence exercised by Sweitzer. In the same petition, contestants sought further probate of a will executed by Mrs. Chapin September 8, 1936. The trial court held the will of November 13, 1940, invalid, on the grounds of incompetency and undue influence, and admitted to probate the will of September 8, 1936.

There are 1389 pages of evidence. Obviously, our review of such a mass of testimony must be confined to the principal points only, and, in so confining it, we must, of necessity, omit discussion of a great deal of evidence which has been relied upon by the contestants in their briefs and upon oral argument, including some very involved evidence which the trial court thought, and perhaps rightly, indicated Sweitzer's untrustworthiness. In the interest of brevity, it will be assumed *arguendo*—but only so—that Sweitzer was fully capable of resorting to undue influence.

In July, 1935, Mrs. Chapin suffered an apoplectic stroke, which produced inability to speak, except to a very limited extent, and partial paralysis of her right arm and leg. Her condition was described by her physician as hemiphlegia of the left side and resultant aphasia. The evidence shows that the stroke in no way affected her intellect, only her ability to speak. For

several years thereafter, she was up and around, receiving visitors, attending to household affairs, and transacting business. Enumerated in the testimony as some of the words she could articulate distinctly are: "Yes," "No," "Louie," (she called Sweitzer "Louie"), "Tea and toast," "peaches," "poor baby," "nice baby," "Oh, boy," "puppy," "Roosevelt," "McKenzie King," "Alabama." As far as her immediate needs were concerned, no one who was intimately acquainted with her and with her gestures and expressions had difficulty in understanding her meaning. Dr. Bouffleur, in describing her condition in 1936, testified:

"Mrs. Chapin was a very forceful character. She had very positive opinions, and she was capable of expressing her opinions. She was interested in political and current affairs. She appreciated a joke and was quite normal, except that she could not speak."

On Christmas day, 1938, after preparing the Christmas dinner, she became suddenly ill and went to bed. From that time until the time of her death, except on occasions when she was able to get up and sit by the window, she was confined to her bed. Sweitzer testified that the last time she was out of bed was in October, 1939. Sweitzer nursed and took care of her. The evidence shows that Sweitzer, for more than twenty-five years, had resided in the Chapin household in Seattle or with Mrs. Chapin on a ranch owned by her at Tete Jaune, British Columbia. At this ranch in British Columbia, Mrs. Chapin spent many years of her life, raising chickens, pigs, and cattle. It was at this ranch that she received the stroke in 1935.

Kay Channel, a young girl whom Mrs. Chapin had employed at the ranch, served as a maid or companion to Mrs. Chapin. She attended Mrs. Chapin in the daytime, and Sweitzer attended her when she called at night. Miss Channel left in April, 1939. Thereafter,

Sweitzer took entire charge of Mrs. Chapin. A maid was employed in the household most of the time, but it was not a part of her duties to take care of Mrs. Chapin. A trained nurse was employed in January and February, 1940, when she was suffering from a bladder ailment, and in January, 1941, just prior to her death. Otherwise, Sweitzer performed all of the services that were performed for Mrs. Chapin in the way of nursing and care. He cooked the food she ate, washed her face, combed her hair, bathed her, answered her calls at night, gave her her medicine, fed her with a spoon during the last months of her life, and otherwise performed all those services which had to be performed for an invalid who was unable to do anything for herself.

The son, Louis, thirty-eight years of age, moved to Portland, Oregon, in the spring of 1938, and to Los Angeles, California, in July, 1940. The last time he saw his mother alive was in March or April, 1940. The sister, Lottie, and her husband, Dr. Bouffleur, generally occupied their home in California during the winter months of each year. The adopted daughter, Evelyn, was a little girl eleven or twelve years of age, whom Mrs. Chapin had adopted in Canada as a baby. Her mother was a young girl whom Mrs. Chapin had employed at the ranch and whose husband deserted her before the baby was born. Evelyn was taken to California by Mrs. Bouffleur. Mr. Chapin was employed by the Chicago and Milwaukee railroad as chief telegrapher. His work required that he be at the office seven days of the week, including Saturday afternoon and Sunday. The evidence shows that he was in such physical and mental condition that it would have been impossible for him to perform for Mrs. Chapin the services that were performed by Sweitzer. He was of the same age as Mrs. Chapin. He paid the expenses of

the household. Mrs. Chapin's brother, Thomas Martin, who resided in California, paid the hospital bills and contributed twenty-five dollars a month toward the expense of taking care of Mrs. Chapin. After Kay Channel left, Sweitzer received from Mr. Chapin thirty dollars a month, which was the salary that Miss Channel had received.

The evidence shows that there was much discord in the family over property and money matters. We shall not attempt to review this testimony, except to mention one incident which is somewhat typical. In March, 1940, Mr. Chapin gave the family car to Louis, who needed a car in his business. Mrs. Chapin objected on the ground that they might need the car and because Louis was not a careful driver, being addicted to the use of intoxicating liquor. Mr. Chapin testified that he explained to Mrs. Chapin that he did not think that they needed a car, and that, if they should need a car, he could obtain another. Mrs. Chapin made her objection known to her sister, Mrs. Bouffleur. She spoke to her husband, Dr. Bouffleur, who informed her that, as the car was community property, Mr. Chapin would be privileged to give it to Louis. Mrs. Bouffleur testified that she communicated to Mrs. Chapin Dr. Bouffleur's opinion with regard to the matter, and that thereafter Mrs. Chapin never mentioned the matter of the car again. Sweitzer went out and purchased a second-hand car, and Mrs. Chapin paid sixty dollars of the down payment.

The evidence shows beyond all question that the services performed by Sweitzer were performed at Mrs. Chapin's request and because it was her wish that she be taken care of by Sweitzer. In the fall of 1939, Mr. Chapin and Mrs. Bouffleur suggested to Mrs. Chapin that she be taken to a sanitarium, but she refused to be sent there. The evidence also shows beyond all doubt that the services performed by Sweitzer for

Mrs. Chapin were most tender and affectionate. The testimony of a young girl who was employed in the household as a maid between September 23, 1940, and November 2, 1940, is typical of all of the testimony relating to Sweitzer's care and treatment of Mrs. Chapin. Called as a witness by contestants, she testified, on direct examination, as follows:

"One day I was doing the ironing and Dick [Sweitzer] came to me and said—Mother had had a very bad night one night, so he says: 'If this keeps up any longer I will be a dead man pretty soon.' And I said, 'I don't see why you wish to keep Mother alive when she is so weak and seemingly so near the end and seemingly wants to be free from it all.' Q. Did you get that impression at times from her? A. Yes, sir. Q. And what did he say? A. Well, he said, 'Well, if she was my mother I would want to keep my mother alive just as long as possible.' And he said that he was just keeping her alive and was working there just because he loved her, and because she was like a mother to him."

Mrs. Mercer, a friend of the family for more than thirty years and whose husband, prior to his death, had for years been chief telegrapher for the Chicago and Milwaukee railroad and Mr. Chapin's superior in the office of that company, testified that she never failed to visit Mrs. Chapin during the period of her sickness at least once a month. In describing Sweitzer's treatment of Mrs. Chapin, she testified: "I don't know how to put it into words. It was just wonderful."

The property in Canada was Mrs. Chapin's separate property, having been homesteaded by her in 1914. Mr. Chapin also, at her request, had executed to her a quitclaim deed to the property. The property at 2008 33rd avenue south was also Mrs. Chapin's separate property, having been deeded to her in 1922 by her brothers, George and Thomas Martin. Mr. Chapin, at the request of the brothers, had also executed to Mrs. Chapin a quitclaim deed to the property. There was no ccm-

munity property, except the salary Mr. Chapin received from the Chicago and Milwaukee railroad.

In 1936, Mrs. Chapin executed a deed to the Canadian property running to Louis, Evelyn, and Sweitzer; also, a written request that, in case of her death, Sweitzer be appointed guardian of Evelyn, who was then six or seven years of age. The deed was never registered, and Mrs. Chapin continued to treat the Canadian property as her own. Later, she entered into a contract to sell part of the property to a Mrs. Clark, and also executed a deed to Mrs. Clark, which, however, was never delivered, as the payments were not completed. In 1936, Mrs. Chapin executed a will, prepared by Dr. Bouffleur, by the terms of which she specifically devised the Canadian property and the property at 2008 33rd avenue south, and all of her personal property, except certain dishes and silverware, which she bequeathed to Evelyn, to Mr. Chapin, Louis, and Evelyn, and appointed Mrs. Bouffleur, and, in case of her death or unwillingness to act, Dr. Bouffleur, executrix of the will. In October, 1939, she executed to Sweitzer a deed to the property at 2008 33rd avenue south, and in February, 1940, a second deed to the same property, to correct an improper acknowledgment to the first. These deeds were recorded very shortly after their execution.

In May, 1940, Mrs. Chapin's sister-in-law, the wife of her brother, Thomas Martin, died in California, leaving a will bequeathing to Mrs. Chapin six hundred dollars a month. The will contained a provision that none of the legacies should be distributed until after the death of her husband, Thomas Martin. Mrs. Chapin was informed of these facts. Mrs. Bouffleur testified that, on her visit to Seattle in August and September, 1940, she explained to Mrs. Chapin that she was a beneficiary under the will of Mrs. Martin, and that, as far as she knew, Mrs. Chapin was fully conversant with all of the facts relating to Mrs. Martin's estate. On October 16,

1940, her brother, Thomas Martin died in California intestate and without issue, leaving a large estate, part of which passed to Mrs. Chapin as one of his heirs at law. Mrs. Chapin was informed of this fact. The value of Mrs. Chapin's interest in her brother's estate amounted to approximately eighty thousand dollars.

The will of November 13, 1940, was prepared by Joseph A. Sweeney, an attorney at law of high standing at the Seattle bar. He testified that he was called to the house by Sweitzer, who informed him that Mrs. Chapin was an invalid and could not come to the office. Prior to this time, he had not been acquainted in any way with either Sweitzer or Mrs. Chapin. When he arrived at the house, he was admitted by Sweitzer. He testified that Sweitzer informed him that Mrs. Chapin desired to make a will, and explained to him Mrs. Chapin's condition. He thereupon asked Sweitzer for a list of the names of the members of the family, which was given him by Sweitzer and which included Sweitzer's name. He thereupon interviewed Mrs. Chapin alone in her room. He testified that she was very cheerful and responded freely to all questions that were put to her, and that there was no doubt in his mind that she was mentally competent to make a will. By putting to her questions which permitted of an affirmative or negative answer, he gained from her all of the information that was used in the preparation of the will. Before leaving the house, he asked Sweitzer if there was a family physician, and, upon being informed that Dr. Foster was the family physician, told Sweitzer that he would like to have Dr. Foster examine Mrs. Chapin and express his opinion as to her mental condition. He told Sweitzer to explain to Dr. Foster that Mrs. Chapin was about to make a will, and that his examination and opinion were desired by reason of this fact.

Dr. Foster testified that he was called to the house by Sweitzer, and that Sweitzer informed him that Mrs. Chapin was about to make a will, and that he examined Mrs. Chapin by asking her questions and informed Sweitzer that, mentally, she seemed quite alert and clear, but that he suggested to Sweitzer that, if he needed any specific information as to the state of her mental condition, he should call in a psychiatrist. It is quite clear from Dr. Foster's testimony that he considered Mrs. Chapin competent to execute a will, although he refused, while on the witness stand, to express an opinion as to her competency, saying that he was not a psychiatrist. Mr. Sweeney testified that Sweitzer called him on the telephone on the morning of November 13th and told him that Dr. Foster had been there. He thereupon called Dr. Foster on the telephone and was informed by Dr. Foster that he had examined Mrs. Chapin and that her mental condition was clear, alert, and active. Dr. Foster's notes of his examination were not made available to Mr. Sweeney until the time of the trial, although he admits that Sweeney made a number of requests that he be permitted to examine them. The notes were not introduced in evidence but it appears from the testimony that they contained a statement: "Mentality quite clear and alert."

Dr. Foster was for some years on the medical and surgical staff of the Milwaukee railroad under its head, Dr. Bouffleur, who drew the will propounded by the contestants, and, although he had returned to private practice, he was still a consultant on the Milwaukee staff. It is very evident from a reading of his testimony that Dr. Foster did not enjoy his role as a witness in this case. He was better qualified to testify as to Mrs. Chapin's condition than any other witness who testified. He began to attend her in January, 1938; saw her frequently during the spring of that year; a dozen or

more times during the spring of 1939; again in the fall; and every month during 1940, except May. During that time, he had cleared up an attack of pellagra, beaten off an attack of beri-beri, and, by the month of November, 1940, during which month the contested will was executed, had reduced her blood pressure to normal.

The witnesses to the will were Mrs. Owen, a neighbor and friend of Mrs. Chapin, whose little crippled girl had been a playmate of Evelyn, Miss Cockrill, who was employed in the household at the time as a maid or domestic and who appears to have been a very intelligent woman, and Mr. Sweeney. Mr. Sweeney testified that the will was read to Mrs. Chapin, paragraph by paragraph, and carefully explained to her, and that she expressed her approval of each and every provision. For some reason not clearly apparent to him, she insisted that he act as the executor of the will. He testified that there was no doubt in his mind that Mrs. Chapin was competent, and fully understood and appreciated all of the provisions of the will.

All of the witnesses to the will testified that Mrs. Chapin was very cheerful, recognized all of them, responded to everything that was said to her, and that, while she was very weak and could sign the will only by making a cross, in their opinion she fully understood that she was making her will, and that she executed the will in their presence and requested them to execute the will as witnesses, which they did, in her presence and in the presence of each other. None of these witnesses was successfully impeached, nor any of the testimony given by them in any way discredited. Mrs. Owen testified that, after the execution of the will, she remained in the room for five or ten minutes carrying on a conversation with Mrs. Chapin, during which the recent presidential election was discussed, and that

Mrs. Chapin expressed herself as being very much pleased with its outcome.

Mrs. Mercer, whom we have referred to above, and who probably was Mrs. Chapin's closest friend in Seattle outside the members of the family, testified that she visited Mrs. Chapin just before the Christmas holidays in 1940, which would be about five weeks after the execution of the contested will, and that Mrs. Chapin recognized her and responded to everything that was said to her. She detailed much of her conversation with Mrs. Chapin, and, assuming her testimony to be true, Mrs. Chapin discussed topics of the day, such as the merits and demerits of Wendell Willkie and Franklin D. Roosevelt, as any sane person might do. She testified that she had no difficulty in understanding Mrs. Chapin, and that her ability to speak was better at the end than at the beginning of her illness. She further testified that it was she who recommended the employment of Mr. Sweeney. This occurred on a former visit. She had heard Mr. Sweeney very favorably spoken of by some of her friends, although she had never met him.

Mrs. Merritt, a trained nurse who attended Mrs. Chapin in January and February, 1940, and for a period of twelve days in January, 1941, just prior to Mrs. Chapin's death, testified that Mrs. Chapin's mind was alert and active up until the time she passed into the final coma during which she passed away. She testified that, in January, 1941, she observed no change in Mrs. Chapin's mental condition from what it had been in January, 1940.

There is nothing in the testimony of Mr. Chapin or Mrs. Bouffleur that in any way indicates that Mrs. Chapin was not mentally competent to make a will. The only testimony of Mr. Chapin that has any direct bearing on that issue is his testimony that Sweitzer talked baby talk to her, and that a few days prior to

her death he asked her if he should call Louis, and she stared at him and shook her head. Mrs. Bouffleur testified that, in her opinion, Mrs. Chapin was incompetent because she could not reason things; if she did not want to take her medicine, she could not be reasoned with as to why she should take it or follow her doctor's advice.

A great deal of medical testimony was introduced bearing upon the nature of hemiphlegia. Many physicians testified that it is a degenerative disease, and that, if a patient dies, not from a sudden stroke, but from the natural progress of the disease itself, mental incompetency will take place before death ensues; and, in response to a hypothetical question, testified that, in their opinion, Mrs. Chapin, on November 13, 1940, was mentally incompetent to make a will. Dr. Flothow, an outstanding authority on hemiphlegia, testified that there was no direct relationship between hemiphlegia and mental capacity, and that a person in Mrs. Chapin's condition might or might not be mentally competent, depending on other circumstances.

We have given careful consideration to all of the evidence in the case and are convinced that Mrs. Chapin, at the time of the execution of the will of November 13, 1940, understood and fully appreciated what she was doing, and had mental capacity to dispose of her property by will. To hold otherwise would be to disregard the undisputed testimony of many witnesses who were intimately acquainted with Mrs. Chapin and had full opportunity to judge of her mental condition by actual observation and contact with her. The testimony of the numerous expert witnesses that, from her medical history, she should, theoretically, have been incompetent on November 13, 1940, must give way to that of the numerous witnesses who saw and talked with her on that day, and testified that she was not.

See *In re Miller's Estate,* 10 Wn. (2d) 258, 271, 116 P. (2d) 526, and particularly the quotations made therein from *In re Collins' Estate,* 174 Cal. 663, 164 Pac. 1110, and *Points v. Nier,* 91 Wash. 20, 157 Pac. 44, Ann. Cas. 1918A, 1046.

We are also satisfied, after a careful consideration of all the evidence, that the will was not the product of undue influence exercised by Sweitzer. Mindful, as we are, that deathbed wills, executed in the presence of beneficiaries who otherwise would not have shared in the estate, should be viewed with the greatest suspicion and all of the evidence subjected to the closest scrutiny, nevertheless we are convinced from the testimony in this case that Mrs. Chapin knew what she was doing and that the will expresses her last wishes relating to the disposal of her worldly goods.

Furthermore, there is nothing unnatural or unjust in the provisions of this will. It bears no evidence on its face that Mrs. Chapin lacked mental capacity or acted under undue influence. No child is unprovided for or other natural object of the testatrix's bounty excluded from its provisions. Indeed, a will by this testatrix which did not in some manner recognize the services which had been performed by Sweitzer during the long period of her last sickness would have been unnatural.

The right to make a will is one of the most valuable rights incident to property. It should not be denied to the aged and infirm merely because of their infirmity. As said by Chancellor Kent more than a century ago:

"It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted

life to command the attentions due to his infirmities. . . . " *Van Alst v. Hunter,* 5 Johnson's Chancery Reports 148, 160 (N. Y.).

The same thought runs through our own decisions. This court has in recent years rendered a number of opinions in cases of this kind in which the rules of law pertaining to incompetency and undue influence have been so thoroughly stated and elaborately discussed that anything further along that line would be superfluous here. One of the most recent is that of *In re Bottger's Estate,* 14 Wn. (2d) 676, 129 P. (2d) 518, decided in September, 1942. See, also, *Dean v. Jordan,* 194 Wash. 661, 79 P. (2d) 331, which contains a wealth of citations; also, *In re Schafer's Estate,* 8 Wn. (2d) 517, 113 P. (2d) 41, decided in 1941, and *In re Miller's Estate, supra,* decided in 1941. In all four of these cases, the contestants failed, although, in our opinion, in each instance they made out a stronger case than the contestants have made in the case at bar.

The following cases, mainly from other jurisdictions, involving wills of persons suffering from paralysis and limitation of speech, and, in some instances, unable to sign except by mark, have also been considered: *Wilson v. Craig,* 86 Wash. 465, 150 Pac. 1179, Ann. Cas. 1917B, 871; *In re Dougan's Estate,* 152 Ore. 235, 53 P. (2d) 511; *Brown v. Jacoby,* 55 Ohio App. 250, 9 N. E. (2d) 693; *Ziegler v. Brown,* 112 Fla. 421, 150 So. 608; *Ducasse's Heirs v. Ducasse,* 120 La. 731, 45 So. 565; *Rothrock v. Rothrock,* 22 Ore. 551, 30 Pac. 453; *In re Latour's Estate,* 140 Cal. 414, 73 Pac. 1070, 74 Pac. 441; *Mendenhall v. Tungate,* 95 Ky. 208, 24 S. W. 431; *In re Mooney's Will,* 132 N. Y. Supp. 705; *Gillespie v. Gillespie* (1817), II Faculty College (Scots Revised Reports) 86; *Delafield v. Parish,* 25 N. Y. 9.

The decree of the trial court is reversed, and it is directed that the will of November 13, 1940, be reinstated

as the last will and testament of Dora E. Chapin, deceased.

BEALS, BLAKE, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—In *In re Bottger's Estate, supra,* we reversed decree of superior court. In *Dean v. Jordan, supra; In re Schafer's Estate, supra;* and *In re Miller's Estate, supra,* we affirmed judgment of trial court. The appellants have not, in the case at bar, sustained on appeal the burden of reversing the trial court, who saw and heard the witnesses and was in a better position than we to weigh the evidence. On questions of fact on conflicting evidence, as here, we should be slow to reverse an able and experienced trial judge. The decree should be affirmed.

May 4, 1943. Petition for rehearing denied.