[No. 29196.   Department One.   January 12, 1944.]

*In the Matter of the Estate of* DORA E. CHAPIN, *Deceased.*[1]

*Lynwood Fix,* for appellants.

*Ballinger, Hutson & Boldt,* for respondents.

JEFFERS, J.—This matter is before us on the petition of Ballinger, Hutson & Boldt and B. H. Camperson to have the court fix an attorneys' fee for their services in representing Joseph A. Sweeney, executor of the last will and testament of Dora E. Chapin, deceased, in a will contest.

The petition in substance alleges:   On November 13, 1940, Dora E. Chapin executed in due form her last will and testament, which has been admitted to probate in. King county, Washington, the testatrix having died on January 14, 1941. (By the will of November 13, 1940, deceased left her property to her husband, Virgil W. Chapin, her son, Louis F. Chapin, her adopted daughter, Evelyn Dorothea Chapin, and Delbert W. Sweitzer, a one-fourth interest to each, naming Joseph W. Sweeney executor.)   Thereafter, on February 14, 1941, Charlotte M. Bouffleur, individually and as guardian of the person and estate of Evelyn Chapin, a minor, Louis F. Chapin, and Virgil W. Chapin instituted a contest of the will of November 13, 1940, and proffered for

[1]Reported in 144 P. (2d) 738.

probate a prior will of Dora E. Chapin. (Under this proposed will, dated September 8, 1936, the husband, Virgil W. Chapin, the son, Louis F. Chapin, and the adopted daughter, Evelyn Chapin, were the only named beneficiaries, and Charlotte M. Bouffleur, a sister of deceased, was named executrix.)

On February 18, 1942, the court declared the will of November 13, 1940, to be invalid and void, and ordered that the same be set aside, at the same time decreeing that the will of September 8, 1936, was the valid, unrevoked will of the deceased, and admitting this will to probate. Joseph A. Sweeney, executor of the will of November 13th, deeming it necessary to do so, employed petitioners to represent him in the will contest, and petitioners did represent him in the hearing in the lower court. Mr. Sweeney, as executor, appealed to the supreme court from the decree holding the will of November 13th invalid and void, being represented by petitioners on such appeal. The supreme court, on March 17, 1943, reversed the judgment of the lower court, and directed the reinstatement of the will of November 13th as the last will and testament of deceased. *In re Chapin's Estate,* 17 Wn. (2d) 196, 135 P. (2d) 445.

The petition further alleges that all of the services to Mr. Sweeney, as executor, were rendered by George H. Boldt, representing petitioners; that Mr. Camperson is now in the United States army, serving abroad, and Mr. Boldt is in the military service of the United States, at present in Seattle, but under orders to proceed to another part of the United States.

It is further alleged that Mr. Sweeney has filed a report as executor under the will of November 13, 1940, which report was approved by the court, February 25, 1942, the order approving the report containing the following paragraph:

"That the said Joseph A. Sweeney as executor, and B. H. Camperson and Ballinger, Hutson & Boldt, as his attorneys, be, and they hereby are, allowed and adjudged entitled to compensation for their respective services rendered herein,

provided that the amounts of such compensation shall be fixed by the court following the time when the decree of this court made and entered February 18, 1942, becomes final."

(This is the decree from which the appeal was taken to the supreme court, hereinbefore referred to.)

It is further alleged that $7,500 is a reasonable sum to be paid petitioners, jointly, as compensation for their services; that, if the remittitur had been sent down and received, Joseph A. Sweeney would have agreed that the above sum was reasonable, would have allowed petitioners' claim, and is willing to submit the claim to the court without awaiting the coming down of the remittitur.

Upon the filing of the petition, the court fixed April 8, 1943, as the date for hearing the petition, and ordered that a copy of the order and petition be served upon Joseph A. Sweeney, and upon Lynwood W. Fix, as attorney for Charlotte M. Bouffleur, individually and as guardian of the person and estate of Evelyn Chapin, Louis F. Chapin, and Virgil W. Chapin.

On May 14, 1943, Lynwood Fix, as attorney for the persons last above named, filed a motion asking for a show cause order directing Delbert W. Sweitzer to appear before the court on May 21, 1943, at the time of the determination of the petition of attorneys for the fixing of fees, and show cause, if any he has, why attorneys' fees for services rendered should not be apportioned between Delbert W. Sweitzer and Joseph A. Sweeney, as executor. A show cause order was issued in accordance with the foregoing motion.

The hearing on the petition and show cause order was continued from time to time, but the matter finally came on for hearing on April 6, 1943. Testimony was taken, and thereafter, on June 14, 1943, the court entered an order fixing the fee to be allowed the firm of Ballinger, Hutson and Boldt, and B. H. Camperson, at $5,000, to be paid from the estate, and denying the motion of Mr. Fix, as attorney

for the persons hereinbefore mentioned, to apportion the fee between Mr. Sweitzer and Mr. Sweeney.

From this order, Charlotte M. Bouffleur, as guardian of the person and estate of Evelyn Chapin, a minor, Louis F. Chapin, and Virgil W. Chapin have appealed to this court.

Appellants' assignments of error are that the court erred in allowing petitioners more than $3,500 as attorneys' fees; in not charging the attorneys' fees allowed between the executor and Mr. Sweitzer; and in charging more than one-half of the fees allowed to the executor.

It appears to be admitted by appellants, as shown by question No. 1, "Statement of Questions Involved," that, where an executor employs attorneys in a will contest with no agreed fee, the attorneys are entitled to reasonable compensation. Appellants contend that any fee in an amount more than $3,500 is unreasonable. The court allowed $5,000.

Appellants' statement of the next question involved is that,

"Where the procurer of a will successfully appeals the judgment of the trial court holding a will invalid, he should pay a reasonable share of the attorneys' fees allowed, especially where he sustained financial benefit from the decision."

These questions require a discussion of the testimony, especially the question of the attorneys' fees allowed.

Some idea of the amount of work done in the will contest by the attorneys here involved may be obtained from the following statement made by this court *In re Chapin's Estate*, 17 Wn. (2d) 196, 135 P. (2d) 445:

"There are 1389 pages of evidence. Obviously, our review of such a mass of testimony must be confined to the principal points only, and, in so confining it, we must, of necessity, omit discussion of a great deal of evidence which has been relied upon by the contestants in their briefs and upon oral argument, including some very involved evidence which the trial court thought, and perhaps rightly, indicated Sweitzer's untrustworthiness."

The evidence in this case as to the services performed by these attorneys, to whom we shall hereinafter refer as respondents, consists very largely of the testimony of George Boldt, of the firm of Ballinger, Hutson & Boldt. His testimony may be summarized as follows: He was engaged in the litigation arising out of the contest of Mrs. Chapin's will, in which Mr. Sweeney was named as executor, as a member of the above named firm, and B. H. Camperson was associated with him in the case. Mr. Boldt was first consulted by Mr. Sweeney in regard to the Chapin estate about the middle of May, 1941, approximately a month before the trial of the will contest. (We shall refer to the will of November 13th as the Sweeney will.) At that time Mr. Boldt was informed of the Sweeney will, and that it had been admitted to probate and a contest started by appellants. Mr. Sweeney at that time outlined in a general way the circumstances surrounding the execution of the will, and asked Mr. Boldt if he would be free to accept employment to represent him (Sweeney) in association with Mr. Camperson in the defense of the contest proceedings. Mr. Boldt informed Mr. Sweeney he would be glad to accept the employment.

From that time until the opening of the trial on June 23, 1941, Mr. Boldt spent considerable time with Mr. Camperson and Mr. Sweeney in interviewing witnesses, examining exhibits, and briefing the law. Mr. Camperson had, prior to the time of Mr. Boldt's employment, made quite an extensive brief on the authorities pertaining to will contests; and Mr. Boldt examined these authorities and did additional briefing, spending considerable time with Mr. Camperson discussing the various points which might be raised in the contest. Doctors were interviewed concerning Mrs. Chapin's condition and the various ailments from which she was said to be suffering. The case involved a very considerable amount of study and preparation, just how much Mr. Boldt could not say, as he did not keep an hourly record of the time spent on it. Mr. Camperson was

with him on practically all occasions when he was working on the pre-trial preparation.

The case came on for trial before Judge Hall, on June 23, 1941, and lasted, with one break of a day, to July 14, 1941. There were three full weeks of strenuous trial. Quoting from Mr. Boldt's testimony:

"I can very honestly say that I never tried a case that I thought was any more difficult or unpleasant to try than this one was. It was exceedingly hard fought throughout and a very large number of witnesses, and many which I thought were rather vague and I think in some instances at least, evasive. The cross-examinations were conducted all by myself. I acted as the leader in the trial of the case, examined the witnesses and presented the argument, with one or two exceptions. Mr. Camperson in one or two instances addressed the court on points of law, and also on one occasion I mentioned there was a day, I believe, when I had some other matter that took me out of the city, and Mr. Camperson on that day continued the argument. Other than that, I presented all phases of it, but Mr. Camperson was in court and available for constant consultation all of the time, and he furnished me with ideas and suggestions, and particularly kept a record of the testimony, which was very valuable because it got very involved, there were so many witnesses.

"We went into the private life and affairs of the Chapin family and all of their adjuncts back to the year, as I recall it, 1910 or something like that. We went into the general details of the 'dirty laundry' of that family for a long period of time, and it was a very difficult case, and I think it would have been impossible for me to have kept all of these details in mind, except for Mr. Camperson and his competent assistance.

"At the conclusion of the trial we conducted an argument, which, as I recall it,—Mr. Fix can correct me on that—but I think it consumed three days or four days. I have forgotten how long now, exactly; but it was extremely lengthy, and in that I think everything that was gone over at the trial was gone over throughout the argument very thoroughly again.

"At the conclusion of that, Judge Hall took the matter under advisement. He had indicated that he would render an early decision. However, he sometime later, the exact time I am sorry to say I haven't got a note of, but I believe

it was in the month of September, Judge Hall wrote us requesting that we submit a memorandum brief, in which we would present an abstract of the testimony that we considered material and important to the decision, and also add such authorities as we cared to suggest.

"Well, the nature of the request was such and the length of time that had elapsed since the trial of the case was such that it was tantamount to making practically a complete statement of the facts of the case; and much of the testimony was transcribed verbatim and other parts was abstracted.

"In addition to that, a very extensive and I think good brief was prepared. I believe that is in the files. I have forgotten the exact length of it, but it was a long brief, and that was submitted to Judge Hall.

"Now, it may be a little bit hard for me to say the exact amount of time I spent on that, but I would estimate as near as I can from my notes, it probably took ten days time, not including the time of typewriting the transcript and the brief, which was no small item in itself.

"The final record in that case ran to 1390 pages of statement of facts. Following that,—I have forgotten the date, unfortunately, and I do not have a note of it readily here. Sometime following that—a considerable time following that a memorandum decision of Judge Hall was rendered, in which he sustained the contest on both of the grounds argued, namely undue influence and incompetency.

"We felt that many important considerations had not been included in the decision, and felt that it was wholly advisable to make a motion for reconsideration, which we did. We prepared such a motion and submitted the data connected with it, which required, I would say, a matter of two or three days in the preparation. And then that matter was brought on for argument and was argued for three days, the motion for reconsideration, during all of which time it was nip and tuck, at least it seemed to me, whether we would be successful or not; and it was very strenuously and vigorously presented. However, ultimately that motion was denied.

"Then the next step in the proceedings was the presenting of a decree and order based upon the decision. This would normally seem to be a simple proceeding; but in this case it proved to be more than that.

"Again, I believe two or three days at various times, and from time to time, were spent in the most vigorous kind of argument over what the terms of the decree should be.

"Following the entry of the decree, the contest having been sustained and Mr. Sweeney having been removed as executor, it was incumbent upon him to present his account as of that time, which we prepared.

"That at that time Camperson and myself prepared and presented and we sought and ultimately secured an order based upon that account, and again there was a very vigorous contest over the terms of the order that should be entered, and the details of the report which was made, which, according to my notes, took two days, that order being entered on February 25, 1942.

"Incidentally, that is the order in which it was decreed that we were entitled to fees as counsel in the matter, but that the fixing of them would be deferred. No appeal, incidentally, was taken from that order or decree, and I figure that it has become final."

It further appears from Mr. Boldt's testimony that they determined to appeal, and so made arrangements for procuring a statement of facts. They then prepared an abstract of the testimony, the greater part of the abstracting being done by Mr. Camperson, and taking about two weeks. Mr. Boldt drew the original draft of the brief, and submitted it to Mr. Camperson. During this time they had a number of conferences over the matter. At least ten days were spent by Mr. Boldt in preparing the brief. The opening brief was 132 pages in length, and Mr. Boldt was of the opinion that every page was necessary to an adequate presentation of the case. A reply brief of forty-one pages was also prepared. The case was argued in this court on June 17, 1942, and Mr. Boldt made both the opening and closing arguments.

Mr. Boldt stated that, considering the size of the estate and the enormous amount of work done upon it, the sum of $7,500 would be a reasonable fee as compensation for his firm and Mr. Camperson for the services performed.

It appears from the cross-examination of Mr. Boldt that, at the time he was employed, it was not known just what the value of the Chapin estate would be, as it was dependent upon the amount received from another estate then being probated in Los Angeles, but Mr. Boldt understood

the amount to which the Chapin estate would be entitled would be a substantial amount. Nowhere in Mr. Boldt's testimony does it appear that, in fixing the fee which he testified was a reasonable one, he used as a basis any fixed amount as the value of the estate.

Mr. Sweeney testified that he was in touch with these proceedings at all times, and that Mr. Boldt's statement of the services performed was accurate, to the best of his recollection. Mr. Sweeney further testified that the chief value of the Chapin estate was Mrs. Chapin's inheritance from the Thomas H. Martin estate in Los Angeles; that he had made inquiry from a Mr. Church, one of the attorneys for the Thomas Martin estate, to ascertain what Mrs. Chapin's portion would be, and was informed it would run between $65,000 and $80,000, after taxes and everything were paid. Mr. Sweeney is an attorney, and he testified that in his opinion a fair and reasonable fee to be allowed respondents would be $7,500.

At a subsequent hearing held on June 4, 1943, Mr. Ballinger stated to the court that, since the value of the estate was one factor the court would no doubt consider in fixing the fee and since the evidence of value seemed to be incomplete, counsel had had a conference that morning, and Mr. Fix had agreed that the value of the estate was $50,000, respondents' estimate being $57,856.10. It was agreed that the court might consider these two estimates as showing the approximate value of the estate.

J. Gordon Gose, an attorney of Seattle, associated with the firm of McMicken, Rupp & Schweppe, was called by appellants, and testified that he knew of the will contest; that he and his firm had assisted Mr. Fix in preparing a petition for rehearing in the case. Mr. Fix then purported to state to Mr. Gose the services performed by respondents, as related by Mr. Boldt, which question included a statement that the value of the estate was $50,000, and Mr. Gose was asked what in his opinion would be a reasonable fee to be allowed respondents for their services.

"I think a fee for all of the factors that you mentioned and the ones I stated I knew something about myself, that a proper maximum fee would be about $3,500."

On cross-examination, Mr. Gose's answers to some of the questions propounded, while undoubtedly frankly and fairly made, do not, at least to us, clearly indicate just what his position was relative to whether or not the estate had been benefited by respondents' services. While Mr. Gose stated that in giving his opinion as to the fee he took into consideration the whole estate, he further answered:

"But I say that the ultimate matter in controversy is really not the whole estate. The whole estate is not changed in the least by the outcome of this litigation. We have to look through the form to the substance, the thing that is really involved here. . . . Q. In other words, it is the duty of the executor to defend the entire will? A. Certainly; but I don't think— Q. And he is not interested at all about where the money shall go, and therefore his attorneys are not interested in where the money shall go, except that it shall go in accordance with the wishes of the testator as expressed in the will? A. That is right; but that does not cast any weight on the reasonable value of the services. You have to take into account what is substantially and ultimately involved."

Frank Harrington, who has practiced law in Seattle since 1927, was also called by appellants, and testified that he had made some study of the Chapin will contest; that he had read the briefs on appeal and the opinion of this court. Mr. Fix propounded to Mr. Harrington a hypothetical question purporting to embody the facts in this case and assuming the value of the estate to be $50,000, and then asked the witness what in his opinion would be the reasonable value of respondents' services, to which Mr. Harrington answered that, assuming the narrative statement of Mr. Fix contained substantially all the facts, a reasonable fee would be $3,500. On cross-examination, Mr. Harrington further testified that, if the value of the estate was $85,000, a reasonable fee would be $5,000 or $6,000; if it was $65,000, a reasonable fee would be about $4,500. Mr. Ballinger then supplemented the

statement made by Mr. Fix in his hypothetical question, and the witness was asked whether or not he understood the services performed by Mr. Boldt and Mr. Camperson were as extensive as detailed by Mr. Ballinger, to which the witness answered:

"No; I don't feel that I can honestly or frankly say they were indicated in such detail or extent in Mr. Fix' question."

Mr. Harrington further answered:

"I will say this, however, if you were to enhance the fee in view of the greater detail which you have indicated, the larger number of services, it might be reasonable to say that a reasonable fee is $4,500."

W. G. McLaren, who has practiced law in Seattle for forty-one years, was called by respondents, and stated that he had listened to the statement of facts made by Mr. Fix and supplemented by Mr. Ballinger; that he had read the opinion of this court in the Chapin will contest; that he had made some investigation of the law concerning what value should be taken into account in determining the fee and the duty of an executor whose will is under attack. Based upon his examination of the record and the statement of facts made by Mr. Fix, as supplemented by Mr. Ballinger, Mr. McLaren was of the opinion a reasonable fee to be allowed respondents, as attorneys for the executor, would be $7,500.

On cross-examination, Mr. McLaren stated that, while in answering the question propounded by Mr. Ballinger he had assumed the estate might be worth between $65,000 and $85,000, it was his opinion that, in this kind of a case where the executor is operating under a will which has been admitted to probate, the amount involved is not entitled to as much consideration as in an ordinary civil action, "for the reason that sound public policy requires an executor to defend a will, he hasn't any choice."

On redirect examination, Mr. McLaren was asked:

"Q. Are there any circumstances that apply in this case that in your judgment make it particularly or peculiarly

difficult? A. Yes. Q. What is that? A. The fact that the appellant, as always, has the laboring oar, and particularly in this case he had a very heavy laboring oar because the lower court in passing upon issues of fact involving the credibility of witnesses had held against him. I read the appellant's brief very carefully for that reason, having in mind that he rendered these services, and to my mind it was the most persuasive brief on the facts that I had ever read."

Frank P. Helsell, who has practiced law in Seattle for thirty-four years, was also called by respondents. Based upon the statement of facts made by Mr. Fix, as supplemented by Mr. Ballinger, Mr. Helsell stated that in his opinion, if the estate had a value of $85,000, the reasonable value of respondents' services would be $7,500 to $8,000. If it was $65,000, the value of the services would be something less, maybe $6,000.

Mr. Helsell stated that in his opinion it was the duty of the executor to defend his will, and the entire will, and the measure of the service would be the time consumed, the result obtained, and the ability of the estate to pay for that service.

On cross-examination, Mr. Helsell was asked what he felt the fee should be if the estate amounted to $50,000, to which he answered: "You can figure out your own percentage that would hold if the value of the estate was reduced."

It will be remembered that counsel submitted to the court two figures as to the value of the estate. Appellants' figure was $50,000; respondents' figure, $57,856.10. It does not appear just what figure the court may have used in connection with the other facts in fixing a fee of $5,000. It is argued by appellants that respondents' testimony was based upon the false premise that the value of the estate was between $65,000 and $85,000, and that such testimony could not aid the court or form a proper basis for fixing the fee to be allowed respondents.

It is undoubtedly true that at the time this case was tried, the actual value of the estate was not determined. However, it is apparent from the testimony of Mr. Boldt that

he did not fix the fee to which respondents, in his opinion, were entitled, upon any fixed value of the estate, other than that the estate would have a substantial value.

■ The amount of the fees to be allowed was in the discretion of the court (*In re Jolly's Estate,* 3 Wn. (2d) 615, 101 P. (2d) 995, 128 A. L. R. 993), and we are of the opinion that, under the facts in this case, the trial court did not abuse its discretion in fixing a fee of $5,000 for the services performed by respondents.

■ It is next contended that the court erred in not apportioning the attorneys' fees between the executor and Mr. Sweitzer, appellants arguing that the estate was not benefited by the services performed, and that Sweitzer was the only person to benefit financially.

It is undoubtedly true that Sweitzer benefited by the Sweeney will being sustained, and it is also true that appellants, who contested the will, did not benefit financially by the services performed, but these facts are not the controlling ones in determining whether or not the estate benefited, and whether or not the attorneys' fee should be paid from the funds of the estate.

We find this statement in Bancroft's Probate Practice, vol. 1, p. 402, § 220:

"Where one named as executor seeks to uphold, in good faith, the will of the decedent against a contest, and it is obviously to the interest of all concerned in the estate that the validity of the will be adjudicated, costs, although such contest is successful and the will is overthrown, are properly taxed against the estate. And since it is part of the duties of the person named as executor, when acting in good faith, to uphold the will, his attorney's fees in sustaining the will, at least where he is successful, are a proper charge against the estate."

In *In re Jolly's Estate, supra,* we upheld the allowance of attorney's fees to the executor and payment of such fees from the estate, even though the executor was not successful in having his will upheld, and where admittedly the services performed were of no ultimate benefit to the estate.

We have held that, when an executor has a will in his

possession, it is his statutory duty to file the same in court, and when probated, to defend it. *In re Vaughn's Estate,* 149 Wash. 291, 270 Pac. 1030; *In re Jolly's Estate, supra.*

Just what may be termed a "benefit" to the estate in a particular case may present room for argument, but we are of the opinion that an estate is benefited at least when the will is upheld, and thereby it is made possible to make distribution of the property of the estate according to the wishes of the testator.

In the instant·case, appellants contested the Sweeney will, undoubtedly on the theory that it did not express the wishes of the testatrix and that the will proposed by appellants was the only valid one. This being true, and appellants having failed in the will contest, they cannot now say the estate was not benefited merely because they would each receive only one-fourth of the property under the Sweeney will, whereas they would have each received one-third of the property under the will proposed by them, to the exclusion of Sweitzer. In other words, the fact that Sweitzer was the only one of the beneficiaries under the Sweeney will who gained financially by having that will sustained, is not the controlling factor in determining whether or not the estate benefited.

In *In re Statler's Estate,* 58 Wash. 199, 108 Pac. 433, the contention was made that the respondent's services were without value to the estate, and hence, since the claim was based upon benefits to the estate, there could be no recovery. In regard to this contention, we stated:

"Considering the estate as an entity apart from the interest of its beneficiaries, it is probably a legitimate argument to say that it can make no difference whether the property of the estate is taken by one set of claimants or by another. But we do not understand that this is what is meant by benefiting the estate. The contest is made by one set of claimants against another, and the benefit derived therefrom inures to the successful claimants, and this we think is the benefit contemplated by the rule. Since the expenses when allowed reduce the residuary share of the successful claimants, they might justly complain if no gain

was derived by them by the contest, but when the contest results in their gain, clearly it furnishes a sufficient consideration for the allowance contemplated by the statute."

· In *Smith v. Haire,* 138 Tenn. 255, 197 S. W. 678, the court had the following to say on the question of benefit to the estate:

"The defendant as executrix propounded the fraudulent will by the terms of which she would have obtained the entire estate of the testator. If the contest had not been instituted, the real will of the testator would have been defeated, and his estate would have passed to one for whom it was [not] intended. The attorneys, seeking compensation out of the estate, succeeding [succeeded] in defeating the fraudulent will and in establishing the true will. . . . There can be no doubt but what the services of counsel in contesting the fraudulent will succeeded directly in establishing the true will. *In this way their services inured to the benefit of the estate."* (Italics ours.)

In the instant case, the services of respondents succeeded in establishing the will of November 13, 1940, and defeating the will offered by appellants, and, in doing this, we are of the opinion their services inured to the benefit of the estate, regardless of the fact that Sweitzer was the only one to benefit financially from having the Sweeney will sustained. See *In re Merica's Estate,* 99 Neb. 229, 155 N. W. 887.

In a note found in 10 A. L. R. 784, under the heading "*Upon Contest.* 1. General rule allowing fees as a charge upon the estate," many cases are cited and discussed, and it is stated generally that, when a contest results over the probate of a will, it is the executor's duty to uphold the will and, if he does so in good faith, attorney's fees incurred by him are a charge upon the estate.

We are of the opinion that the sum allowed respondents was a reasonable fee for the services performed for the executor, and that such services were of benefit to the estate and properly ordered paid from the estate.

The judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, STEINERT, and GRADY, JJ., concur.