In re Downing's Will.

*June 3—July 3, 1903.*

*Wills: Probate: Mental capacity: Undue influence: Evidence: Witnesses: Attorney and client: Admissibility of testimony of attorney who drafted will.*

1. Evidence offered on application for probate of a will, stated in the opinion, considered, and *held* to show that the written instrument offered for probate did not emanate from the testator's mind, but was made by others and imposed on him.

2. Sec. 4076, Stats. 1898 (providing that an attorney or counselor at law shall not be allowed to disclose a communication made by his client to him, or his advice given thereon, in the course

of his professional employment), is nothing more than a re-enactment of the common law.

3. Under sec. 4076, Stats. 1898, while an attorney who draws a will will not be allowed, without the consent of the testator, while living, to testify to communications made to him concerning the will, or its contents, when the will is presented for probate after the testator's death, such attorney may testify as to directions given him by the testator, and such testimony is properly admitted in evidence in the proceeding.

APPEAL from a judgment of the circuit court for Buffalo county: E. W. HELMS, Circuit Judge. *Reversed.*

This is an appeal from a judgment affirming the order and judgment of the county court admitting to probate what purports to have been the will of Thomas Downing, deceased, which reads as follows:

"I, Thomas Downing, of the town of Glencoe, county of Buffalo and state of Wisconsin, being of sound mind and memory, and mindful of the uncertainties of human life, do make, publish, and declare this my last will and testament in manner following, to wit:

"First. I desire and hereby authorize the early payment of all my just debts and the payment of the expenses of my last sickness and funeral without waiting for administration of my estate and estates.

"Second. I hereby give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed, of every kind and description, in equal shares, parts and proportions, share and share alike, to Mrs. Mary Cashel, *Catharine T. Cashel, Mrs. Mary Gleason,* Miss Catharine M. Cashel, Miss Margaret E. Cashel, John A. Cashel, Miss Laura A. Cashel, *Miss Mae. Cashel* and Miss Clara E. Cashel.

"Third. I hereby nominate and appoint *Miss Mae Cashel,* of Glencoe, Buffalo county, Wisconsin, to be executrix of this, my last will and testament, and I hereby authorize and empower her to sell at private sale all my personal property, and to sell at public sale on twenty-one (21) days' written notice, all my real estate, subject to the approval of the county court of said Buffalo county, Wisconsin, at any time within one year from and after my death, and to then divide and dis-

tribute the proceeds equally to those herein above named as
my legatees.

"In witness whereof I have hereunto set my hand and seal
this 3rd of March, A. D. 1901.

" Jos. LETTENBERGER.        " Thomas  $\overset{\text{his}}{\underset{\text{mark.}}{\times}}$  Downing.  [Seal.]
" M. ENGLISH.

"The above instrument, consisting of one sheet of paper,
was, on the day of the date thereof, signed, published and de-
clared by the said testator to be his last will and testament,
in the presence of us who have signed our names at his re-
quest as witnesses; in his presence and in the presence of each
other.

"Jos. LETTENBERGER, Arcadia, Wis.
"M. ENGLISH, Arcadia, Wis."

A trial being had, the court found, as matter of fact, in
effect: (1) That Thomas Downing died March 3, 1901, at
the age of 69 years; (2) of catarrhal pneumonia, which de-
veloped from a bad cold contracted five or six days before his
death; (3) which gave him considerable pain, greatly re-
duced his strength, and induced him to refrain from talking;
(4) that up to the time of his last sickness he was in good
health; superintended the management of the Michael Cashel
farm and managed his own business affairs; (5) that he first
took to his bed Saturday night, March 2, 1901, and he made
the will in question between four and six o'clock in the after-
noon of March 3, 1901, and died about twenty minutes before
nine o'clock on that night; (6) that the immediate cause of
his death was physical obstruction of the air passages of the
lungs by secretion, common in such diseases, which he was
too weak to clear and which came on very suddenly after eight
o'clock that night; (7) that he was a bachelor, and at the
time of his death resided, and for more than thirty years next
prior thereto had resided and made his home, with the family
of his half-brother Michael Cashel; (8) that said Michael
Cashel died October 1, 1891, and left, him surviving, his
widow, Mary A. Cashel, and six children, viz., Catharine

M. Cashel, Margaret E. Cashel, John A. Cashel, Clara E. Cashel, Alice Cashel, and *Mary Cashel;* (9) that *Mary Cashel* is the person named as executrix in the will; (10) that at the time of his death the testator owned a farm and two lots in Arcadia, and a few notes and mortgages, all of the value of about $8,000; (11) that he left him surviving, as his sole heirs at law, one half-brother, *John L. Cashel,* one half-sister, *Mary Gleason,* one half-sister, *Catharine T. Cashel,* and the six children of Michael Cashel, named in finding No. 8; (12) that March 3, 1901, between four and six o'clock p. m. of that day, the testator duly made, executed, published, and declared the instrument in controversy as his last will and testament; (13) that the said instrument so made was the last will and testament of the said deceased; (14) that Thomas Downing was at the time said will was signed by him of sound mind, and had sufficient testamentary capacity to execute said will; (15) that no undue influence was exercised in the making or procuring of said instrument proposed as a will. And as conclusions of law the court found: (1) That the said Thomas Downing had at the time of making said will sufficient testamentary capacity to make a will; (2) that the instrument mentioned in finding No. 12 was Thomas Downing's last will and testament, duly executed, published, and declared as such; (3) that the order and judgment of the county court admitting said will to probate should be affirmed, and ordered judgment to be entered accordingly. From the judgment so entered, *Mrs. Mary Gleason, Catharine T. Cashel,* and *John L. Cashel,* mentioned in the eleventh finding of fact, bring this appeal.

For the appellants there was a brief by *Higbee & Bunge,* and oral argument by *E. C. Higbee.*

*S. G. Gilman,* for the respondent.

CASSODAY, C. J. The important question presented is whether the 12th, 13th, 14th, and 15th findings of fact are

supported by the evidence. It is undisputed that the testator was taken with a cold on Tuesday—five days before his death. On the following Thursday he hitched up his team and drove to Arcadia, and called on Dr. Palmer. Mrs. Mary A. Cashel doctored him for his cold, and he was around until Saturday evening, March 2, 1901, about supper time, when he went to bed. Dr. Lettenberger was called to treat him on the afternoon of that day. He found him suffering from catarrhal pneumonia, or capular bronchitis, and gave him hypodermic injections of sulphate of strychnine and small doses of brandy and milk. On Sunday morning, March 3, 1901, the testator sat up in bed and ate his breakfast of toast and coffee. Dr. Lettenberger saw him that morning between nine and ten o'clock, and remained with him about thirty minutes. Dr. Lettenberger, while at dinner, was again called by telephone to see him, and got there near two o'clock on that afternoon, and gave him an injection, the same as the day before, and gave him more that afternoon, and also gave him brandy and milk in the form of nourishment, and remained there with him until he died, about twenty minutes before nine o'clock on the evening of that day. Dr. Mewer, of Winona, was called and examined him for treatment about eight o'clock that evening. He became unconscious some twenty or thirty minutes before he died. It is very manifest that he failed very rapidly during the whole day, and especially during the afternoon and evening. It appears that, about half past two o'clock of that Sunday afternoon, Dr. Lettenberger asked Mrs. Mary Cashel and her son John A. "whether Mr. Downing had any papers to make or matters to straighten out—fix up—some words to that effect; that it was, perhaps, best for him to attend to it." The doctor then went back and told Mr. Downing that he thought it would be best for him—if he had any matters to straighten up or to fix up—perhaps it would be best for him to do so; that Downing then asked if he was dangerously ill, and was told that he was, and then,

after pausing a few minutes, he told the doctor that he supposed then that he had better make a will, and the doctor told him perhaps he had better do so. The doctor then told Mrs. Mary Cashel and her son John A. what he had said, and thereupon it was suggested that Richmond should be sent for, and he was sent for, and came, and drew the paper in question. The subscribing witness English testified that Richmond got there "after five, about five, about four o'clock—a little after four o'clock;" that they had to hunt up a lamp for him to write by. The young man, John A. Cashel, testified that it was about half past four o'clock when Richmond got there. Richmond testified to the effect that they came for him a few minutes after six in the evening, just as his supper was ready, and that it was somewhere between half past six and a quarter of seven o'clock in the evening when he got to Cashel's house. The court found that the will was executed between four and six o'clock in the evening. The doctor, who seems to be especially relied upon by the proponents, testified to the effect that after Richmond came, and had been there a few minutes, he said: "Now, Mr. Downing, how do you want this will made?" Downing made no response. Then it was suggested that perhaps he was timid, and so English and Barry withdrew, leaving Richmond and the doctor alone with the testator. Richmond then said: "Now, Mr. Downing, how do you want this will made? Do you want it equally divided, or do you want it in equal shares, or do you want to leave it to one party? Just state to me how you want this will made." But Downing made no response to any of such questions. Thereupon the doctor repeated the questions. It took ten or fifteen minutes to do so. Downing seemed to be very much absorbed in thought, but gave no response. Then he was asked: "Do you want it divided in equal shares among the following"—then the names were stated. The doctor could not state positively whether the question was, "If you want this divided in equal shares

among the Cashels, or members of the family." He thought
Richmond gave the names, and, in order to get the initials,
as he presumed, he went out for the names in full of the
Cashel children and the widow, and so on, and then came
back and read the names to Downing again, after "in equal
shares among the following," and Downing assented by nod-
ding his head after the reading of every name; that Rich-
mond then asked whom he wanted for his executor, and, after
pausing a moment, he said, *"Mae,"* and Richmond said, *"Mae
Cashel?"* and he said, "Yes;" that after that the will was
read over to him, and he was asked if that was his last will
and testament, and he said, "Yes." With some apparent re-
luctance, the doctor was forced to admit that at no time, in the
presence of Richmond, did Mr. Downing utter any other
words than *"Mae"* and *"Yes."* Richmond testified to the
effect that when he got there he asked Mr. Downing what he
wanted of him, but got no response; that he appeared to be a
very sick man, suffering much, in constant pain—constantly
moving in bed. Part of the time, while in a reclining posi-
tion or in a sitting posture, his eyes were closed, and his head
dropped forward upon his breast most of the time. When
the doctor talked to him, repeating the questions he had asked,
or asking questions himself, and arousing—shaking him—he
would open his eyes. After Barry and English left the room,
Richmond made further effort to have Mr. Downing tell what
he wanted—what business he wanted transacted or done—if
anything; that he then took hold of his hand and asked him
what he wanted done, what business he had to do, why he had
sent for him, but got no response. The doctor then suggested
that he wanted to make a will; that the business he wanted
done was to make a will; that he (Richmond) then asked
Downing if he wanted to make a will, but got no response;
that the doctor then repeated the question to him a number
of times, but that he made no response—at least, Richmond
observed none; that Richmond asked him as to whom he

wanted to will his property, but he made no response; that Downing at no time gave him the name of any person to whom he desired to leave his property, or gave him any direction as to how he should draw the will. The doctor "said he wanted to will his property to Mrs. Cashel and her family;" and he had the doctor repeat that question to him several times, as to "whether he wanted to will his property to Mrs. Cashel and her family," and "he finally made a response by a motion of his head"—he nodded his head. When the will had been prepared, down to the clause appointing an executor, Richmond went into the bedroom and had the doctor "ask him who he wanted named in the will as executor, and he made a feeble attempt to speak a word which sounded like the word *"Mary"* or *"Mae,"* but that he did not speak any other word in his (Richmond's) hearing while he was there; that the widow gave him the names to be included in the will; that he asked Mr. Downing if he wanted to include Miss Kate Cashel, and he bowed his head and assented; that, on being asked several times if he wanted to include *Mrs. Gleason,* he finally nodded assent; that, after the writing of the will was completed, it was read over to him, and he was asked if it was his last will and testament, and, after that question was repeated to him several times, he assented, by a motion of the head, that it was, and the will was then executed.

Upon such evidence, we are called upon to determine whether the written instrument in controversy was properly admitted to probate as the last will and testament of Thomas Downing, deceased. Unlike most written instruments, a will, in this state, must be established in court by proof, as prescribed by the statute, before it goes into effect. Sec. 3788, Stats. 1898; *Jones v. Roberts,* 96 Wis. 431, 432, 70 N. W. 685, 71 N. W. 883. Probate of a will is essential to the passing of title to property. Sec. 2294, Stats. 1898. The measure of proof to establish a will, in case of contest, is suggested by the requisite mental capacity to make a will as ad-

judged by the courts. It was held in New York, many years ago:

"It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect. in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them." *Delafield v. Parrish,* 25 N. Y. 9, 29, followed in *Van Guysling v. Van Kuren,* 35 N. Y. 70, 74.

That language has been repeatedly approved by this court. *Holden v. Meadows,* 31 Wis. 294; *In re Blakely's Will,* 48 Wis. 300, 4 N. W. 337; *In re Lewis' Will,* 51 Wis. 104, 105, 7 N. W. 829; *McMaster v. Scriven,* 85 Wis. 169, 170, 55 N. W. 149; *In re Butler's Will,* 110 Wis. 70, 77, 78, 85 N. W. 678. Does the evidence show that the testator had such comprehension? Did he have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and hold them in his mind a sufficient length of time to perceive their obvious relations to each other, and form any rational judgment in relation to them? The doctor said that Mr. Downing wanted to will his property to Mrs. Cashel and her family, and yet the will includes two half-sisters, but leaves out the half-brother. He did name *"Mae"* for executrix, but there is not a word of evidence that he wanted to authorize the payment of debts and expenses without waiting for administration—much less, that he wanted to authorize the sale of all his personal property at private sale, and all his real estate at public sale, on twenty-one days', notice, within a year. It seems to be conclusively established that neither the provisions of the will, nor the substance of those provisions, ever emanated from the mind

of the testator. On the contrary, those provisions must have emanated from others, and, when stated to him or read to him, he, in his weakened and passive condition of mind, merely assented by nodding. The ravages of disease and the near approach of death had manifestly weakened his memory and destroyed his mental force, so as to make him incompetent to make a valid will, within the rules of law stated in the authorities cited. In other words, it appears from the evidence that the written instrument in question did not emanate from his mind, but was made by others and imposed upon him. The case is quite similar to *Mendenhall v. Tungate,* 95 Ky. 208, 24 S. W. 431.

2. But it is claimed that Richmond was an incompetent witness by reason of the statute which declares that "an attorney or counselor at law shall not be allowed to disclose a communication made by his client to him, or his advice given thereon, in the course of his professional employment." Sec. 4076, Stats. 1898. This section is more narrow than the preceding section, precluding physicians from disclosing "any information . . . acquired in attending any patient." This section simply precludes an attorney from disclosing "a communication made by *his client to him,* or his advice given thereon, in the course of his professional employment." This language is too plain to require construction. It has recently been applied by this court in a case where an attorney who had received from his client authority, as an agent, to enter into a contract with a third person, and had acted thereon; and it was held that such attorney was not precluded by that section from testifying as to the giving of such authority, if it came in question. *Koeber v. Somers,* 108 Wis. 497, 503– 511, 84 N. W. 991. The distinction is there pointed out between such communications and advice which fall outside of the attorney's professional employment, and transactions which come within the prohibitions of the section. It is there shown that by closing the mouth of the attorney as to

transactions or agreements where he is himself a party, or where he is in reality a mere agent or trustee, there would be presented an opportunity to perpetrate fraud and wrong, not only upon third parties, but also upon the attorney himself and the good name of the profession. That such is the danger is there illustrated by the citation of numerous authorities. What is said in that case is amplified in the more recent case of *Herman v. Schlesinger*, 114 Wis. 382, 392–394, 90 N. W. 460. Among other things, it is there said:

"We are unable to see how communications between an attorney and a person not his client, while conducting a business matter with such person for his client, whether he is acting professionally at the time or not, can be classed with those named in the statute. A communication made by a person to his attorney, to be and in fact communicated by him to another, is not privileged, because, in the very nature of things, it is not confidential in character. The very purpose thereof is to have the communication repeated to one who is under no obligation not to divulge it. That being the case, manifestly a reply to such a communication must be governed by the same rule, and so must, also, other communications between the attorney and the third person, in case of negotiations between the two."

There is no better reason for excluding the testimony of Richmond than there is for excluding the testimony of the attending physician under the previous section. And yet this court has held, in effect, that a subscribing witness to a will is necessarily expected to give testimony as to the execution of the same. *Alberti v. N. Y., L. E. & W. R. Co.* 118 N. Y. 77, 23 N. E. 35; *McMaster v. Scriven,* 85 Wis. 162, 55 N. W. 149. The doctor appears to have been present with Mr. Downing, and necessarily heard and witnessed all that took place between Downing and Richmond. But the question may be considerd on broader grounds. All the authorities, including the two recent adjudications from this court, agree that the section of the statute in question is nothing more than a re-enactment of the common law. *Koeber v. Somers,* 108

Wis. 504, 84 N. W. 991; *Hurlburt v. Hurlburt,* 128 N. Y. 424, 28 N. E. 651; *State ex rel. Hardy v. Gleason,* 19 Oreg. 162, 23 Pac. 817. It was held in England, many years ago:

"The reasons of the rule which protects from disclosure communications made in professional confidence apply in cases of conflict between the client or those claiming under him, and third persons, but do not apply in cases of testamentary disposition by the client as between different parties, all of whom claim under him. The privilege does not belong to the executors as against the next of kin, but, following the legal interest, is subject to the trust, and incident to which the legal interest is subject." *Russell v. Jackson,* 9 Hare, 387.

That case was followed in Massachusetts, where it was expressly held:

"The attorney who draws a will will not be allowed, without the consent of the testator while living, to testify to communications made to him concerning the will, or to its contents; but, when the will is presented for probate after the testator's death, the attorney may testify as to directions given to him by the testator, so that it may appear whether the instrument presented for probate is or is not the will of the alleged testator." *Doherty v. O'Callaghan,* 157 Mass. 90, 93, 31 N. E. 726.

To the same effect, *Scott v. Harris,* 113 Ill. 447; *Winters v. Winters,* 102 Iowa, 53, 56, 71 N. W. 184; *Layman's Will,* 40 Minn. 371, 42 N. W. 286; *Coates v. Semper,* 82 Minn. 460, 85 N. W. 217. In this last case it was held, under a statute substantially like ours:

"An attorney at law who draws a will, and attends the person executing the same, to give advice, is not prohibited, on account of his relations as such counsel, from testifying concerning the facts connected with such execution, in a contest thereon."

The Iowa statute is quite similar to ours. In the case at bar the reasons for admitting Richmond's testimony are much stronger than in any of the cases cited. There is no

evidence that Mr. Downing was a client of Richmond's in the business transacted. There is no evidence that Downing made any communication to him, unless it was first filtered through the doctor, or some member of the Cashel family, or both. Every nod and affirmative utterance of Downing, made in the presence of Richmond, was also made in the presence of the doctor, or the doctor and others, and not in secret. Downing asked no advice of Richmond, and Richmond neither gave nor attempted to give him any advice—much less, "in the course of his professional employment." Although Richmond was an attorney at law, yet in drawing the written instrument in controversy he acted in the capacity of a mere scrivener, and his testimony was clearly admissible. *Hatton v. Robinson,* 14 Pick. 416; *Borum v. Fouts,* 15 Ind. 50; *Hanlon v. Doherty,* 109 Ind. 37, 9 N. E. 782. Thus it was held in one of the Indiana cases cited:

"When the terms of a contract have been agreed upon between the parties, and an attorney is afterwards employed, as a scrivener merely, to reduce the contract to writing, and no inquiry is made of him as to its legal effect, communications made to him while thus engaged will not be regarded as privileged."

We must hold that the testimony of Richmond was properly admitted as evidence in the case.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded, with directions to reverse the order and judgment of the county court, and for further proceedings according to law.

On September 29, 1903, it was ordered that the taxable costs of both parties be paid out of the estate.