WILL OF KING: KING, Appellant, vs. JORGENSON, Respondent.*

*September 9—October 14, 1947.*

* Motion for rehearing denied, with $25 costs, on December 23, 1947.

For the appellant there were briefs by *Willis E. Donley,* attorney, and *William B. Collins* of counsel, both of Menomonie, and oral argument by *Mr. Collins.*

For the respondent there was a brief by *Wilcox, Wilcox & Sullivan* of Eau Claire, and oral argument by *Francis J. Wilcox.*

BARLOW, J.   William H. King died October 19, 1946, at the age of forty-four years.   He lived with his parents at Eau Claire, Wisconsin, until January, 1946, with the exception of a short time when he was married and lived with his wife until he was divorced.   He continued to live with his father after the death of his mother in January, 1946, with the exception of short intervals when he would have a disagreement with his father and move to the home of his sister Elvira Jorgenson, who lived in the city of Eau Claire and provided quarters for him whenever he desired to use them.   He was injured in an automobile collision June 28, 1945, which caused a heart disorder, from which he suffered to the time of his death.   September 29, 1946, his father ordered him from his home, and he went to the home of his sister Elvira Jorgenson, and entered the Luther hospital at Eau Claire September 30, 1946, where he remained as a patient until his death.   He had, in addition to his father, one brother and three sisters.   While he was at the hospital both his father and his sister Elvira Jorgenson visited him daily.   His sister Mildred L. Swanke, who lived at Spooner, Wisconsin, came to Eau Claire to visit testator and other members of her family.   She had visited them at least once a month for a considerable period prior to this trip.   She arrived at the hospital about 6 p. m., October 17th, and her sister Elvira Jorgenson was there visiting testator.   During the conversation testator said he had prepared a will giving all of his property to the sister Elvira Jorgenson.   He produced a sheet of paper in his own handwriting to this effect.   After some conversation testator requested Elvira Jorgenson, sole beneficiary under the will, to copy it so it would be neat, making some additions which he had talked over with Mildred Swanke.   Elvira Jorgenson copied the will in her handwriting.   Two nurses in the hospital were called by Mildred Swanke to witness the signature and they came to testator's room about 7 p. m.   They were told by Mrs. Swanke

they were being called to witness the execution of a will. When they arrived one of the nurses who witnessed the will read it to the testator in the presence of his two sisters and the other witness, at which time he signed it in the presence of the two nurses and they signed as witnesses in his presence and in the presence of each other. At that time he stated, "That is the way I want it."

The first question presented is whether Dr. F. C. Kinsman, attending physician, was competent to testify as to information he acquired in attending the testator in a professional character necessary to professionally serve him. The father, Nels King, who is the sole heir at law, expressly consented to the doctor's testifying. Proponents of the will objected to his testimony, and the testimony was then taken under a stipulation by counsel for the proponents that it be received subject to continuing objection to all testimony of the doctor bearing on any information he obtained necessary to the treatment of William King in his professional capacity. Appellant contends the evidence was competent under sec. 325.21, clause (4), Stats. The trial judge in his decision did not rule on the question nor did he state whether he considered this testimony in arriving at his conclusion. It is said in *Estate of Southard* (1932), 208 Wis. 150, 155, 242 N. W. 584:

"It is a fact, of which notice may be taken, that in the course of a trial before the court evidence is frequently taken over or subject to objection, without any intended finality in the ruling, and the presumption exists, even where an objection is overruled, that the incompetent evidence was not considered by the court in disposing of the issues."

Even though we apply this rule to the decision of the trial court it must still be determined what evidence is competent to be considered on this appeal. Sec. 325.21, Stats., so far as material, provides as follows:

"No physician or surgeon shall be permitted to disclose any information he may have acquired in attending any patient in

a professional character, necessary to enable him professionally to serve such patient, except only . . . (4) with the express consent of the patient, or in case of his death or disability, of his personal representative or other person authorized to sue for personal injury or of the beneficiary of an insurance policy on his life, health, or physical condition."

The rule of evidence prohibiting the admission of a physician's testimony is one which did not exist at common law, and the legislature has been very meticulous in limiting its admissibility. This is not an action by a beneficiary of an insurance policy on the life, health, or physical condition of a deceased person or a person under disability, nor is it an action authorized by law to be commenced in the name of some other person to recover damages for personal injury as provided in clause (4) of the statute in question. Here the express consent is limited to the personal representative of the deceased, which in the *Estate of Gallun* (1934), 215 Wis. 314, 254 N. W. 542, was held to mean the executor or administrator of the deceased. It is argued that the father, being the sole heir at law, is the personal representative within the purview of the statute. We are unable to agree with this position. If the father were also deceased and the brother and three sisters of the testator were the sole heirs at law, and two of them were contesting the will and two supporting it, it could not be said that any one or all of them qualified as the personal representative of the deceased. It is considered the words "personal representative," as used here, mean the executor or administrator of the deceased. The testimony of the witness as to information acquired in attending testator in a professional character necessary to professionally serve him was not admissible, and the objection to all testimony so prohibited should have been sustained.

Appellant and contestant relies on mental incapacity and undue influence to defeat the will. On both issues he has the burden of proof by clear, convincing, and satisfactory evidence.

*Estate of Scherrer* (1943), 242 Wis. 211, 7 N. W. (2d) 848;
*Will of Schaefer* (1932), 207 Wis. 404, 411, 241 N. W. 382;
*Will of Grosse* (1932), 208 Wis. 473, 476, 243 N. W. 465;
*Estate of Sawall* (1942), 240 Wis. 265, 3 N. W. (2d) 373.
The precise questions are, (1) whether testator, on October 17, 1946, had sufficient mental capacity to make the will in question; (2) whether the execution of said will was procured by undue influence exercised upon him.

On the question of mental incompetency, there is the testimony by the father that shortly prior to testator's entering the hospital he was insane; that he was afraid of testator and one night had a loaded gun under his pillow because he "didn't know what William was going to do." There is an abundance of testimony that testator was competent at all times, and the court could well disregard this testimony of the father. Main reliance is had on the fact that within forty-six hours of the time the proposed will was executed testator had fourteen administrations of opiates for rest and to deaden his constant pain, two of which were within three hours of the time the will was executed. The record in the hospital shows they were the usual and average dosages of drugs, such as demerol and pantopon, at three to four hour intervals during testator's waking hours. The testimony of the witnesses who had an opportunity to observe him is that at the time the will was prepared and executed he was in sound mind, alert, knew what he wanted, and had full testamentary capacity. While it is conceded that opiates have some effect on the alertness and judgment of persons to whom they are administered, this effect varies widely in individuals, particularly in relation to the amount of drugs to which they are accustomed. The evidence clearly sustains the trial court on the question of mental competency.

In order to establish that Elvira Jorgenson exercised undue influence upon testator to procure the execution of this will, the essential elements to be proved are: (1) A person unques-

tionably subject to undue influence; (2) opportunity to exercise such influence and effect the wrongful purpose; (3) disposition to influence unduly for the purpose of procuring an improper favor; and (4) a result clearly appearing to be the effect of the supposed influence. *Estate of Scherrer, supra; Will of Raasch* (1939), 230 Wis. 548, 557, 284 N. W. 571; *Will of Stanley* (1937), 226 Wis. 354, 356, 276 N. W. 353; *Will of Leisch* (1936), 221 Wis. 641, 648, 267 N. W. 268. Where three elements are established by clear, convincing, and satisfactory evidence slight additional evidence as to the fourth element may compel an inference of its existence. *Will of Raasch, supra.*

It is argued that testator was susceptible to undue influence because of his physical condition. He was suffering constant pain, was on his deathbed, sedatives and opiates were administered, all of which tended to weaken his resistance, and the fact that he made a will was not disclosed to the father until after testator's death. The weakness of this position is that there is no evidence to show the opiates had the effect on testator's mental capacity that would be necessary to sustain this contention, but to the contrary the testimony of the nurses is that he was mentally alert, was interested in what was going on; that he was a man of strong will at all times and was very insistent on getting exactly what he wanted, and that he was not easily influenced. No confidential relationship existed between testator and beneficiary, nor was he under the control of the beneficiary where access by others was denied, as was true in *Will of Leisch, supra,* and *Will of Stanley, supra,* relied upon by appellant.

The sole beneficiary had an opportunity to exercise such influence, as she visited him daily while he was in the hospital and saw him frequently prior to that time. The father also visited him daily while he was in the hospital, and all members of the family had an opportunity to visit him as frequently as it was convenient for them to do so. Both the father and the

sister are to be commended for visiting testator frequently, unless it was done with ulterior motives, as he was a very sick man and their visits were undoubtedly a source of comfort and satisfaction to him.

The only proof offered by contestant that Elvira Jorgenson, sole beneficiary, had a grasping disposition, is the testimony that she urged her father to deed his residence property to her, and his farm property to a brother, the residence property being far more valuable. There is no testimony that she at any time prior to the execution of the will attempted to induce testator to give his property to her or even to exact compensation from him for board or lodging or other favors extended to him in her household. She was solicitous of his welfare as a sister, and there is no evidence of a disposition or effort on her part to obtain the property of testator at any time, unless it be inferred from the conditions surrounding the execution of the will and the terms of the will.

The sister Elvira Jorgenson is the sole beneficiary under the will, and appellant argues this is proof of undue influence as no provision was made for the father, two sisters, and a brother. It appears the father owned his own home and had sufficient property to properly care for himself in his old age, and the son was ordered to leave his father's home when he was a very sick man, requiring hospitalization within two days of that time. One of the sisters, Mildred Swanke, was present at the time the will was executed, and testator talked with her about the terms of the will. This disposition of his property was not a decision made on the day the will was executed because testator had previously drawn two holographic wills, one in May, 1946, and one sometime thereafter, which he exhibited just prior to the execution of this will. In both of the holographic wills he gave all of his property to the same beneficiary who received it under the terms of the will in question. The will being in the handwriting of the sole beneficiary, standing alone, requires an explanation, but this is fully ex-

plained by the sister Mildred Swanke who testified testator requested Elvira Jorgenson "to copy it so it would be neat." While the conditions under which this will was executed are not those to be desired, it is considered there is ample evidence to sustain the trial court in finding there was no undue influence or mental incapacity of the testator, and in admitting the will to probate.

*By the Court.*—Judgment affirmed.