## Will of Williams: Williams, Appellant, vs. Heywood, Respondent.

*January 11—February 7, 1950.*

For the appellant there was a brief by *Doar & Knowles* of New Richmond, and *Nippert & Nippert* of Cincinnati, Ohio, and oral argument by *W. T. Doar.*

For the respondent there was a brief by *Wilcox & Sullivan* of Eau Claire, and oral argument by *Francis J. Wilcox* and *Arthur B. Sullivan.*

MARTIN, J. This appeal presents the issues as raised by the objection of the contestant, Christine Williams, and also questions of law as to the competency of certain testimony offered by the proponent, John D. Heywood, and received on the trial.

The circumstances relating to the execution of the will are as follows: John D. Heywood, an attorney of nine years' experience, had been the legal advisor of the deceased since

1941.  Deceased sought legal advice from several attorneys during the early forties, but the last years employed Heywood almost exclusively.  During the months of May, June, and July, 1948, while deceased was staying at the Hotel Hudson, Heywood saw him frequently, principally on professional matters.  While deceased was at the Deaconess Hospital, Heywood saw him every day except on July 30th and August 1st.  On July 31st, August 2d, and 3d, deceased talked with Heywood about drawing a will.  Heywood had previously drawn wills for him on December 8, 1945, and October 29, 1946.  The talk with the deceased on August 3, 1948, regarding the drafting of a will was lengthy and resulted in the deceased giving detailed instructions to Heywood for the preparation of a will.  Pursuant to such instructions, Heywood prepared a will which was executed on August 4th.  The provisions of this will proved unsatisfactory to the deceased and necessitated a number of changes with pen and ink.  He wished different disposition made of the residue, giving only one half thereof to the Episcopal church, and one half to trustees for charitable and other purposes for the benefit of the city of Hudson, instead of the entire residue going to the Episcopal church.  Deceased and Heywood were alone in the room at the time these instructions were given.

Heywood arrived at the Deaconess Hospital shortly before noon on August 5th with the new will.  Deceased was asleep when he arrived.  He therefore waited around until deceased awakened.  Heywood then went over the will with him paragraph by paragraph.  Occasionally deceased would make some comment about a provision in the will and would ask that a clause or sentence be reread to him, which was done.  Deceased was in a weakened condition and unable to sit up without assistance.  Consequently, the head of the bed was elevated during this discussion of the will.  The only other persons in the room during this discussion were Miss New-

ton, deceased's private nurse, and possibly an interne might have been in and out.

After the will had been gone over, deceased wanted the bequest to St. Paul's Episcopal church changed from $1,000 to $5,000, and the purposes for which the bequest was to be used set out. This was accomplished by Heywood with pen and ink.

About 1:30 p. m., Heywood had Miss Wieland, the acting superintendent of the hospital, called into the room to serve with Miss Newton as witnesses to the will. Deceased directed the nurses how to prop him up in a sitting position with his feet hanging over the side of the bed. While in this position, with Miss Newton and Miss Wieland standing close to him, he signed the will, initialed the changes, and declared to Miss Newton and Miss Wieland that the document was his will and requested them to sign the same as witnesses. Deceased was then swung around so that he was lying on the bed with his head elevated. The will was placed on the dresser next to the bed, in plain view of the deceased, where Miss Newton and Miss Wieland each initialed the changes and signed in the presence of the testator and of each other. The only persons in the room during the time of the execution of the will were the testator, the attorney, and the two witnesses.

Heywood then placed the will in his brief case and walked out into the hall where he met Essie Williams, a sister of the deceased. She inquired if a bequest to her, which deceased had previously indicated he wanted in the will, was contained in the will just executed. When she was informed by Heywood that it had been overlooked, she was much concerned about it and so informed Heywood. Heywood then went back into the room where deceased lay and talked the matter over with him. Deceased then directed Heywood to prepare a codicil providing for a bequest to his sister, Essie Williams, in sufficient amount to pay his widow for her dower interest

in lands which deceased had a week or so previously conveyed to his sister. The codicil was read to deceased, who made some comment concerning it and had a part of it reread. Deceased was then propped up in a sitting position by Miss Newton and Miss Thomsen, who had just come on duty as private nurse to relieve Miss Newton. Miss Newton left and Clara Duea, a nurse on general duty, was called in to witness the codicil. Shortly after 3 p. m., deceased signed the codicil in the presence of Verda Bell M. Thomsen and Clara Duea. The codicil was then placed on the bed table at the foot of deceased's bed and Verda Thomsen and Clara Duea signed it in full view of deceased and in the presence of each other.

From the time deceased entered the Deaconess Hospital until he left he was given or permitted to administer to himself dosages of morphine by injection varying from one twelfth to one eighth of a grain to each dosage. At about noon on August 5th, before the will was executed, deceased asked for and received two injections of morphine of one-twelfth grain each at one-half hour intervals.

Appellant and contestant relies on mental incapacity and undue influence to defeat the will. On both issues she has the burden of proof by clear, convincing, and satisfactory evidence. See *Will of King* (1947), 251 Wis. 269, 273, 29 N. W. (2d) 69.

Contestant contends that the undisputed evidence that the testator had been a narcotic addict for many years and just before the execution of the will in question had received two dosages of morphine, is proof of lack of general testamentary capacity.

The two private nurses and Heywood testified that the narcotics had little or no effect on the testator, except to make him a little more alert and relaxed, and this is substantially the testimony of all the witnesses who testified on that subject, including those of the contestant. When the effect of the morphine wore off, he became somewhat irri-

table. Dr. Rosen, a qualified expert, in response to a hypothetical question, and Dr. Dawson, the only expert called by contestant, testified that if an addict were given dosages of morphine to which he was accustomed, it would have no effect on his mental condition. Dr. Rosen testified further that morphine does not affect the mind of an addict. The evidence clearly shows that the use of narcotics had not impaired testator's testamentary capacity. See *Will of King, supra,* where the validity of a will was sustained under similar circumstances.

The general rule, often expressed by this court, is that the test of mental competency is whether testator had sufficient active memory to comprehend, without prompting, the condition of his property, his relations to those who might be his beneficiaries, and to hold these things in mind long enough to perceive their relations to each other and to be able to form some rational judgment in relation to them. See *Estate of Boston* (1948), 253 Wis. 8, 13, 33 N. W. (2d) 257.

The evidence was undisputed that the deceased was a shrewd and capable businessman who had accumulated by his own efforts a large estate, that he was a very successful doctor, and that he had a strong will and was not easily influenced. The number and size of the bequests set forth in his will, which was dictated by him, is proof of his knowledge of the extent and condition of his property. The evidence is undisputed that he knew who his wife and children were and his relationship to them, and they were all named in the will.

Contestant produced evidence that deceased was forgetful at times and that he was confused or vague about certain details. The basis for his widow's testimony on this point was that he was forgetful about little things around the house, that he would forget the number of their lockbox, and that there were times when she would have an appointment to

meet him and he would forget about it and drive home without her. Another witness testified she saw him in Hudson in the spring of 1948 and that he appeared confused, and another that she met him in St. Paul in March, 1948, that they drove around awhile, that deceased was rather nervous and upset over the divorce proceedings, and he became confused and thought he was in Minneapolis when they were in St. Paul. This testimony indicates that deceased was at times forgetful but not that his memory was impaired to the extent of having a bearing on his testamentary capacity. There is credible evidence that the deceased at all times, up to and including August 5, 1948, recognized the people with whom he came in contact, remembered their names, and talked intelligently of things that happened in the past. His good memory is evidenced by the long list of friends remembered in his will.

Contestant produced witnesses who testified in detail as to the deceased's violent temper, to his acts of cruelty, that he was abusive to his wife and to his help, that he did not drive his automobile well, that at times he was confused, to the fact that he kept guns around the house, and that he kept large sums of money, consisting of cash and checks, in the house at all times. However, the witnesses remained in close and friendly relationship with the testator after the incidents described and expressed admiration for him, did business with him, and assisted him in medical and other actions. The testimony of the contestant's witnesses relating to the peculiar behavior on the part of the deceased falls far short of proof that deceased was of unsound mind and lacked testamentary capacity. Their testimony reveals that the deceased had a violent temper, that at times he was irritable and cruel, that at other times he was kind, and that he was eccentric, but these things do not show incapacity to make a will. Furthermore, contestant's witnesses, except for one who last saw deceased on July 4, 1948, had not had any

contact with him for months or years. The many disinterested witnesses for the proponent who had ample opportunity to observe the conduct and actions of the deceased right up to and including the time of the making of the will, testified that he was of sound mind. It is elementary that the question of competency is to be determined as of the time of the execution of the will. See *Estate of Kesich* (1944), 244 Wis. 374, 383, 12 N. W, (2d) 688.

The record shows that the deceased and contestant's mother were divorced in 1907, and since that time deceased saw very little of the contestant. In December, 1927, the contestant and the deceased had an argument in a hotel in Cincinnati and, as a result of it, the contestant left in anger and stated she did not want to see him again, and she did not see him after that. Some time later she visited his sister at Hudson, Wisconsin, but she did not contact him. For twenty-one years prior to his death, the contestant did not see or visit with her father. In previous wills executed by the deceased, the legacy to contestant was $5, but this amount was increased to $500 in the last two wills. In view of the feeling which existed between the contestant and deceased, it was not unnatural for him to treat her as he did in his will. Under the circumstances, testator's bequest to his daughter cannot be said to be the result of a delusion. The essential fact is clear that when he dictated and later executed his last will his attitude was not so without reason as to amount to a delusion or obsession. Having the capacity, he had the right to dispose of his property as he pleased. See *Will of Elbert* (1943), 244 Wis. 175, 11 N. W. (2d) 626.

The facts in the present case clearly distinguish it from the authorities cited by appellant.

The elements necessary to establish undue influence in the execution of a will are susceptibility of the testator to influence, the disposition and opportunity of another person to exercise such influence, and a result indicating the exercise

of undue influence by the person so disposed and so situated. See *Estate of Feeley* (1948), 253 Wis. 204, 210, 33 N. W. (2d) 139.

The only person that there could be any question about in that regard is Essie Williams, a sister of the decedent. She called to Heywood's attention the omission of a bequest to her which the deceased had wanted in the will. As a result, the testator's attention was called to this fact and a codicil was executed providing for this bequest. However, there is no evidence of a disposition on the part of Essie Williams to influence the testator and there is absent a result showing the exercise of such influence as the bequest therein is a minor one. The series of wills in evidence indicate a strong and continuing desire for several years to benefit the church in which he was interested, to benefit the community, and to benefit the persons and employees who had been kind to him at various times during his life. It seems natural that the testator would not desire that a substantial portion of his property go to the children from whom he had been estranged over a long period of time. The undisputed evidence is that the testator was a person of very strong will and not easily influenced.

Appellant contends that under the provisions of sec. 325.16, Stats., because Mr. Heywood was named as an executor and a trustee in the will in question and was authorized to make reasonable charges for his legal services in addition to the statutory executor's fees, that he was barred as a person who derives his title or his interest in a transaction with the deceased.

It was held in *Anderson v. Laugen* (1904), 122 Wis. 57, 63, 99 N. W. 437, that the person named as executor in a will, who appears as proponent in a contested proceeding for its probate, with no other interest in the estate of the deceased, is not incompetent to testify to personal transactions or communications with the deceased.

In *Estate of Novak* (1923), 181 Wis. 16, 18, 193 N. W. 1000, it was held that one who is named as executor in a will is competent to testify in proceedings for the probate of the will. The court stated:

"The test to be applied in all such cases is very much the same as the test applied at common law, where one interested in the outcome of a case was held incompetent to testify as a witness. 1 Greenleaf, Evidence, sec. 390, states that 'the true test of the interest of a witness is that he will either gain or lose by the direct legal operation and effect of the judgment, or that the record will be legal evidence for or against him in some other action. It must be a present, certain, and vested interest, and not an interest uncertain, remote, or contingent.' We cannot see that a trustee has any greater interest than has an executor in the outcome of proceedings for the probate of a will. He takes nothing under the will, and he will neither gain nor lose by the result of the proceedings, any more than an executor. Any compensation that may accrue to him will not come as a gift but as a *quid pro quo* for services rendered. He is nominated as a part of the machinery by which the will of the testator is carried into effect, and he is compensated merely for services rendered should his nomination be ratified by the court. This was not such an interest as disqualified a witness at common law, and we do not think it constitutes an interest within the meaning of sec. 4069 where the trust is not coupled with a beneficial interest."

The trial court, by its rulings and opinion, limited the testimony of Mr. Heywood which it considered so as to exclude communications. Mr. Heywood's testimony as to observations and his opinion as to mental capacity of the testator, based on such observations, are admissible under the statute. See *Schultz v. Culbertson* (1905), 125 Wis. 169, 172, 103 N. W. 234.

Appellant contends also that Mr. Heywood was incompetent to testify under sec. 325.22, Stats., barring testimony by a lawyer as to communications or advice given by or to a client in the course of his professional employment.

We recognize the rule that testimony, even testimony received without objection, is incompetent if it relates to a communication embraced within the statute, and have noted the cases cited by appellant supporting this point.

It was held, *In re Downing's Will* (1903), 118 Wis. 581, 593, 95 N. W. 876, that while an attorney who draws a will will not be allowed, without the consent of the testator, while living, to testify to communications made to him concerning the will, or its contents, when the will is presented for probate after the testator's death, such attorney may testify as to directions given him by the testator, and such testimony is properly admitted in evidence in the proceeding.

Mr. Heywood's testimony is admissible for it deals with observations, circumstances, directions, opinion as to sanity and the basis therefor, and all other matters which were made known to him for the purpose of being communicated to another, or being made public. The record shows that the trial court limited Mr. Heywood's testimony to such matters.

Appellant has made the same objection applicable to Donald S. Farr. His testimony was as carefully limited by the trial court as in the case of Mr. Heywood. Practically all of the testimony of these two witnesses was of observation made from nonlegal contact and, therefore, was not barred by sec. 325.22, Stats.

The only objection to the competency of the witnesses, Dr. Johnson and Dr. Drake, was made under secs. 147.02 and 147.14, Stats.,—that they were not licensed to practice medicine in Wisconsin. Both doctors testified they had numerous opportunities to meet and talk with the testator in a nonprofessional capacity, and that they were the attending and treating physicians of the testator during the period of the execution of the will in question. The trial court carefully limited examination of the doctors to observations and opinions within the scope of a layman's testimony. Therefore, even though they were foreign doctors, they were not barred

352

from testifying as to their observations and general layman opinion as to the condition and mental capacity of the deceased. Appellant cites no authorities for his contention— neither do we find any. A careful reading of the statutes referred to plainly does not allow a construction to support this contention.

We have carefully reviewed all the evidence in this case and it amply supports the action of the trial court in admitting the will of August 5, 1948, to probate.

*By the Court.*—Judgment affirmed.