247 Minn. 580 (1956)
78 N.W. (2d) 364
IN RE ESTATE OF EMMA C. KOENIG.
KATHERINE M. PARKER
v.
WALBURGA BARRETT AND OTHERS.
No. 36,781.
Supreme Court of Minnesota.
July 6, 1956.
Robbie & McKeon, for appellant.
Thomas, Bradford, King & Collatz, for respondents.
*581 KNUTSON, JUSTICE.
This is an appeal from an order denying proponent's motion for amended findings or a new trial in a will contest.
Emma C. Koenig was born in South Dakota on March 22, 1894, and died in St. Joseph's Hospital in St. Paul on September 27, 1953. She left surviving her five sisters, Katherine M. Parker of Sisseton, South Dakota; Walburga Barrett of the same place; Sophie Otto of Anaconda, Montana; Mary Theis of Park Rapids, Minnesota; and Gertrude Theis of Arlington, Minnesota, and one brother, Edward M. Schmaus of Sisseton. In addition thereto, she left several nieces and nephews, children of deceased brothers and a half-sister.
During the lifetime of Mrs. Koenig the relationship between herself and her sisters and brother was very good. The members of the family were close to each other; she frequently visited with them, and they visited with each other.
Mrs. Koenig's estate consisted of her homestead located in St. Paul valued at approximately $20,000; household goods worth about $1,200; wearing apparel worth about $500; jewelry of the value of about $550; and cash in the amount of $225. In addition thereto, she left a life insurance policy which was payable to her sisters and brother in equal shares.
For some time prior to her death, Mrs. Koenig had suffered from cancer. On August 11, 1953, she entered St. Joseph's Hospital on account thereof. On August 18, 1953, her attending physician, Dr. Phil C. Roy, wrote her sister Katherine Parker that in all probability Mrs. Koenig would not recover. As a result, Mr. and Mrs. Parker, their son Lyle, Mrs. Barrett, and Eddie Schmaus drove from Sisseton, South Dakota, to St. Paul on August 18 to visit Mrs. Koenig. They remained here until August 20. At that time Mrs. Koenig's body was bloated; she could not retain food; and she was weaker than she had been before. She recognized her visitors and talked with them. When the others returned to Sisseton, Mrs. Parker remained in the Koenig home and thereafter visited with her sister every day.
*582 Pursuant to a suggestion by Dr. Roy that she should put her affairs in order, an attorney whom Mrs. Koenig had known for many years was called to the hospital. He went to the hospital on August 27 and saw Mrs. Koenig alone in her room. After obtaining information as to how she wished to dispose of her property, the attorney prepared a will and returned with it the following day. It was executed by Mrs. Koenig at that time. In that will Mrs. Koenig gave Mrs. Parker a diamond ring and one of her two fur coats. She gave the other coat to her sister Mrs. Barrett. She then provided that all her property, real and personal, including her homestead, should be sold as soon as a reasonable price could be obtained for it after her death, and out of the proceeds she gave her sister Sophie Otto the sum of $500, the residue to go to her sisters, Mary Theis, Gertrude Theis, Katherine M. Parker, and Walburga Barrett, and her brother, Edward M. Schmaus, in equal shares. She appointed her brother, Edward M. Schmaus, and Mrs. Parker jointly as executor and executrix of the will.
On September 15, the same attorney received a call from a roomer at the Koenig home informing him that Mrs. Koenig wanted to see him again. In response to that call he again went to the hospital. He was informed by Mrs. Koenig that she wanted to change her will. Pursuant to information he then obtained, he redrafted the will. In it she made Mrs. Parker sole executrix. Instead of giving one fur coat to Mrs. Parker and the other to Mrs. Barrett, she gave them both to Mrs. Parker. She again provided that her property, real and personal, should be sold as soon after her death as a fair and reasonable price could be obtained for it, and she again gave Sophie Otto the sum of $500. She gave $50 to the St. Columbus Catholic Church, the residue being again bequeathed to "my dear and loving following-named sisters and brother, or the survivor or survivors of them, in equal shares, share and share alike, to-wit: Mary Theis of Park Rapids, Minnesota; Gertrude Theis of Arlington, Minnesota; Katherine M. Parker, Walburga Barrett and Edward M. Schmaus, all of Sisseton, South Dakota."
The draft of this will was brought to the hospital on September 17. Mrs. Koenig then informed her attorney that she had changed her *583 mind and that she wanted to leave everything to Mrs. Parker. A new will thereafter was drafted in which all her property, except $50 which was left to the church above named, was given to Mrs. Parker. This will provides that in the event Mrs. Parker predeceased the testatrix her property was to go "to my dear and loving following-named sisters and brother, or the survivor or survivors of them, in equal shares, share and share alike, to-wit: Mary Theis of Park Rapids, Minnesota; Gertrude Theis of Arlington, Minnesota; Walburga Barrett and Edward M. Schmaus, both of Sisseton, South Dakota." In this will she nominated Mrs. Parker as executrix of the will. The will was signed by testatrix and witnessed by the attorney and one of the nurses on duty at the hospital.
The will dated September 18, 1953, was admitted to probate by the probate court of Ramsey County. An appeal was taken to the district court by all the sisters and the brother included in the will of August 28 who had been left out of the later will. After a lengthy trial, the district court found that testatrix lacked testamentary capacity when the will of September 18 was executed and that it was executed as the result of undue influence exerted upon her by Mrs. Parker. The court further found that the will of August 28 was the last will and testament of testatrix.
This appeal is from an order denying proponent's motion for amended findings or a new trial.
Proponent here contends: (1) That the court erred in admitting the testimony of Dr. Phil C. Roy, the attending physician of Mrs. Koenig, and certain hospital records over the objection of Mrs. Parker that they were privileged communications; (2) that the evidence does not sustain a finding of mental incompetency; and (3) that the evidence does not sustain a finding of undue influence.
At the outset, it is obvious that, if the evidence sustains a finding either that testatrix lacked testamentary capacity or that the will was executed as the result of undue influence, there must be an affirmance unless error exists which will require a new trial.
1. Dr. Roy was, and for a number of years had been, the attending physician for Mrs. Koenig. Over the objection of Mrs. Parker, *584 who was named in the will under consideration as executrix and residuary legatee, Dr. Roy testified that in his opinion Mrs. Koenig was not mentally competent to make a will on September 18.
M.S.A. 595.02, as far as here pertinent, reads:
"Every person of sufficient understanding, including a party, may testify in any action or proceeding, civil or criminal, in court or before any person who has authority to receive evidence, except as follows:

* * * * *
"(4) A licensed physician or surgeon shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity; after the decease of such patient, in an action to recover insurance benefits, where the insurance has been in existence two years or more, the beneficiaries shall be deemed to be the personal representatives of such deceased person for the purpose of waiving the privilege hereinbefore created, and no oral or written waiver of the privilege hereinbefore created shall have any binding force or effect except that the same be made upon the trial or examination where the evidence is offered or received;"
The last part of (4) was enacted by L. 1919, c. 513, and refers only to claims for insurance. It has no bearing on the questions involved here.[1]
While the authorities are not in harmony on the question whether the physician-patient privilege may be waived by the heirs of a decedent as against the one named in the will as executor or executrix, some of the divergent views may be explained by a difference in the statutes in the various states. Even where the statutes are the same, there is some difference in the authorities. It should be kept in mind that the physician-patient privilege did not exist at common law but was created by statute, first in New York in 1828[2] *585 and then later in about two-thirds of the states.[3] The original purpose of this statute was to encourage full disclosure by a patient to his physician by forbidding disclosure of information obtained in such confidential communication.[4] Mostly by judicial decision, the privilege was extended to prevent disclosure after death of the patient. Some of the courts held, and still hold, that there can be no waiver of the privilege after the patient's death.[5] Some of the states which originally followed this rule now permit some waiver due either to a statutory change or a change in judicial decision.[6] The cases on this question are collected in Annotations, 31 A.L.R. 167 and 126 A.L.R. 380. It would serve no useful purpose for us to extend a discussion of the cases here.
In Minnesota we already are committed to the rule that there may be some waiver.[7] In Olson v. Court of Honor, 100 Minn. 117, 123, 110 N.W. 374, 377, 8 L.R.A. (N.S.) 521, 528, we said:
"Does this privilege [physician and patient] become absolute on the death of the patient, or may those who represent him or claim an interest under him after death waive the privilege for the protection of such interest? This is an important question; for if they cannot waive the privilege given by the statute, and their adversary may invoke it to suppress the truth and defeat the enforcement of rights the deceased provided for them in his lifetime, then the statute may be made an instrument for cheating justice. If such be the proper construction of the statute, then, if an executor or legatee presents a will for probate, which is contested on the ground that *586 the testator was of unsound mind when the will was made, the executor or legatee may not, if the contestant objects,[8] call the physician who was attending the testator at the time to testify as to his knowledge of the patient's mental condition, acquired in attending him. * * *

* * * * *
"* * * Upon principle and what seems to be the weight of judicial authority, we hold that the statute in question is for the protection of the patient, and he may waive the privilege if he sees fit, and that, as a general rule, those who represent him after his death may also waive the privilege, for the protection of interests which they claim under him."
We cited and followed the case of In re Layman's Will, 40 Minn. 371, 42 N.W. 286. That case involved an attorney-client privilege. While there is an historical difference in that the attorney-client privilege existed at the common law while the physician-patient privilege did not, essentially the question of waiver after death involves the same consideration. In that case we said (40 Minn. 372, 42 N.W. 287):
"* * * The object of the rule, so far as it relates to this class of communications, being the protection of the estate, there remains no reason for continuing it when the very foundation upon which it proceeds is wanting. The testimony called for was quite necessary in order to determine the weight which ought to be given the witness' opinion as to the mental condition of the testator, and his disclosures in no way reflected upon the character or reputation of the deceased. The testimony when given served to protect the estate, and tended to aid in a proper disposition of it. The issue in the case was as to the mental soundness of a person under whom each litigant claimed, and, whatever the result, the interest and the estate of the deceased were not prejudicially affected. It is not an action in which the success of an adverse third party must prove detrimental to the property. Neither of these litigants can be permitted to invoke the rule respecting privileged communications for the purpose of *587 excluding material and important evidence of the character above described upon the only question involved in the dispute, namely, the sanity of the deceased."
In the case of In re Estate of Cunningham, 219 Minn. 80, 83, 17 N.W. (2d) 85, 87, we said:
"Dr. M.R. Williams had been decedent's physician during his last illness and for several years prior thereto. He was called as a witness for proponent. Contestants unsuccessfully objected to this testimony on the ground that it was privileged, and now claim that the court erred in overruling their objection. It is the rule in this state that the privilege attaching to testimony of a testator's physician may be waived by the executor or executrix named in the will."
It is therefore apparent that we are already committed to the rule that the person named in a will as executor may waive the privilege. Is there any sound reason why the heirs who are contesting the validity of the will may not do so? It should be kept in mind that the subject of inquiry is whether the instrument under consideration is the decedent's will at all. If the testator lacked mental capacity to make a will, the instrument is not a will at all. Nor is the person nominated as executor a legal representative.[9] In such case the position of the heirs who claim the testator lacked mental capacity is no more adverse to the estate than the position of the one who asserts mental capacity. The whole purpose of the inquiry is to determine what is the truth of the matter with respect to the mental competency of the testator. While the question probably is not before us here, it should be the rule also that there need not be unanimity among the heirs before there can be a waiver.[10]
A rule permitting waiver by the heirs is in accord with the weight of authority.[11] It establishes a rule which permits rather than *588 hinders the ascertainment of the truth of the matter under question. In McCormick, Evidence, § 105, we find the following:
"* * * In contests over the validity of a will, where both sides  the executor on the one hand and the heirs or next of kin on the other  claim under and not adversely to the decedent, the assumption should prevail that the decedent would desire that the validity of his will should be determined in the fullest light of the facts. Accordingly in this situation either the executor or the contestants may effectively waive the privilege without the concurrence of the other."
The rule is stated in 58 Am. Jur., Witnesses, § 440, as follows:
"The majority rule is * * * that heirs as well as the personal representative of a deceased patient may waive the protection of the statute as to the privileged nature of information obtained by an attending physician. The fact that the attending physician securing information from his patient was the patient's son has been held not to alter the rule.
"Under the majority rule stated above, heirs may waive the privilege in a contest with strangers or with other heirs. Thus, when the dispute is between the devisee and heirs at law of a testator, all claiming under the deceased, either the devisee or heirs may call the testator's attending physician as a witness. This rule applies in actions to set aside a will and in proceedings to contest the probate of a will, because, as has been declared, the proceedings are not adverse to the estate. But even where this view obtains, the courts have authority to protect the memory of deceased persons from objectionable disclosures."
We therefore hold that, in a contest over the validity of a will where the testamentary capacity of the testator is involved, the heirs who contest the will, as well as the one nominated as executor, may waive the physician-patient privilege insofar as the testimony *589 of the doctor relates to the mental capacity of the testator. It follows that it was not error to admit the testimony of Dr. Roy.
Inasmuch as the claim of privilege respecting the hospital records is based on the physician-patient privilege, it follows that, if the heirs can waive the privilege insofar as the testimony of the doctor is concerned, they likewise may waive the privilege with respect to these hospital records. In view thereof, it is not necessary to further discuss the admissibility of the hospital records involved here.
2. Proponent next contends that, even if the testimony of Dr. Roy is admissible, the evidence still does not sustain a finding of lack of testamentary capacity.
In addition to the opinion of Dr. Roy, the parties stipulated that, if Dr. Dudley Hilker, a partner of Dr. Roy, were called as a witness, his opinion would be the same as that of Dr. Roy. One or the other of these doctors saw testatrix every day while she was in the hospital.
While the other sisters and brother were not in St. Paul on September 18, the date when the last will was executed, they were there on September 6 and 7 and again on September 21. They testified that, while Mrs. Koenig recognized them, there was a marked change in her mental condition on September 21. Edward Schmaus stated that in his opinion testatrix was not capable of disposing of her property on September 21. Mrs. Koenig did not mention to them that she had made a new will, and they had no knowledge that such will was signed until after her death.
It is not necessary to relate in detail all the evidence in the case. In addition to direct testimony of witnesses and their opinions, there are other facts from which an inference of lack of understanding might be drawn. The attorney who drew the will testified that, in the will drafted on September 15, Mr. Schmaus was removed as joint executor by Mrs. Koenig because "she was afraid that Eddie would sell everything; she said that he wanted to get some money and he wanted to sell everything; she was afraid of him and she didn't trust him. She thought that he would go through with her property so to speak." Still, in both the will signed on August 28 and the will drafted on September 15, she directed her executors to *590 sell all her property, real and personal, as soon as a fair and reasonable price could be obtained. Even in the last will in which she gave all of her property to Mrs. Parker, she provided that in the event Mrs. Parker died before she did she gave the residue "to my dear and loving following-named sisters and brother," thereafter naming the same sisters and brother who had been included in the prior will. The language used in the will is not consistent with the position which the witnesses supporting the will take and could well lead to a belief on the part of the trial court that some of this testimony was not entitled to great credence.
The evidence supporting proponent's position consists of the opinion of the attorney who drafted the wills, the nurse who signed as attesting witness, other nurses in the hospital, and Mrs. Parker. While this testimony undoubtedly would support a finding of mental competence, the credibility of the witnesses and the weight to be attached to their opinion were for the trial court. After a thorough review of all the evidence, we are convinced that the evidence does sustain a finding that, on the date the last will was signed, the mental condition of Mrs. Koenig had deteriorated, due to the progressive ravages of the disease which caused her death a few days later, to the point where she no longer had testamentary capacity.
3. In view of our decision on the issue of mental competence, there must be an affirmance. Consequently, it is unnecessary to pass on proponent's contention that the evidence does not sustain a finding of undue influence. We wish to say, however, in that regard that about all the evidence shows on this issue is an opportunity to exert influence due to the fact that Mrs. Parker was the one who came to the assistance of her sister to a greater extent than the others and was in close proximity to her during the last days of her life and a suspicion from the fact that she was close to her that she did exert undue influence upon her in procuring a change in her will from the disposition of her property which formerly had existed. There is no evidence that Mrs. Parker took advantage of the opportunity she had. The attorney who drafted the will conferred with testatrix alone. If we were to assume that Mrs. Koenig was mentally *591 competent at that time, it is doubtful that this decision could stand.
Affirmed.
MURPHY, JUSTICE (dissenting).
I am unable to agree with the views of the other members of the court and therefore dissent.
NOTES
[1] In re Estate of Cunningham, 219 Minn. 80, 17 N.W. (2d) 85.
[2] See, 8 Wigmore, Evidence (3 ed.) § 2380; McCormick, Evidence, § 101.
[3] There appear to be 17 states which still do not have any statute creating such a privilege. McCormick, Evidence, § 101.
[4] See, 8 Wigmore, Evidence (3 ed.) § 2380a; Snyker v. Snyker, 245 Minn. 405, 72 N.W. (2d) 357.
[5] See, for instance, McCaw v. Turner, 126 Miss. 260, 88 So. 705; Auld v. Cathro, 20 N.D. 461, 128 N.W. 1025, 32 L.R.A. (N.S.) 71; Colwell v. Dwyer (Ohio App.) 35 N.E. (2d) 789.
[6] Compare, for instance, In re Will of Hunt, 122 Wis. 460, 100 N.W. 874, and Will of King, 251 Wis. 269, 29 N.W. (2d) 69; see, also, Grieve v. Howard, 54 Utah 225, 180 P. 423.
[7] In addition to the cases discussed, see Mageau v. G.N. Ry. Co. 103 Minn. 290, 295, 115 N.W. 651, 653, 946, 15 L.R.A. (N.S.) 511, 513.
[8] The question here is whether the converse should be the rule.
[9] See, Winters v. Winters, 102 Iowa 53, 71 N.W. 184.
[10] See, Gorman v. Hickey, 145 Kan. 54, 64 P. (2d) 587; Annotations, 31 A.L.R. 167, 181, and 126 A.L.R. 380, 384.
[11] In Annotation, 31 A.L.R. 168, the annotator said:

"The weight of authority, under the statutes of most of the states, is that the right of waiver is not limited to the patient himself, but after his death extends to those who may properly be regarded as standing in his place or representing him."
To the same effect, see Annotation, 126 A.L.R. 380.